# EXHIBIT B

CONFIDENTIAL



**NONCOMPETITION AGREEMENT**

  This Employee Noncompetition Agreement ("<u>Agreement</u>") is entered into as of 31 January 2023 (the "<u>Effective Date</u>") by and between Jump Operations, LLC (the "<u>Company</u>" or "<u>Jump</u>"), and Liam Heeger ("<u>me</u>", "<u>I</u>", or "<u>Employee</u>"). (Employee and Company are each a "<u>Party</u>" and collectively the "<u>Parties</u>" and the employment relationship between the Company and me shall be referred to herein as the "<u>Relationship</u>"). Any capitalized terms used and not defined in this Agreement shall have the respective meanings given to them in the Confidential and/or Proprietary Information Agreement.

In consideration for the Company's agreement to employ and compensate me, including the compensation specifically provided herein, grant me access to its proprietary information, provide specialized training and development to me, and for other good and valuable consideration, the sufficiency of which I acknowledge, the Company and I acknowledge and agree as follows:

1. **FACTUAL ACKNOWLEDGMENTS.** The Company represents and I recognize and acknowledge the following:

    a. The Group Companies are engaged in the following activities, among others (the "<u>Business of the Group Companies</u>"):

        i. trading and investing in and with reference to a wide range of products, instruments, items and events, including futures; commodities; equities, options, and other securities; energy; currencies, cryptocurrencies, digital tokens, and other digital assets; debt; and swaps and other derivatives related to the foregoing, including directly with counterparties; and

        ii. the development of, design of, research regarding, building, implementing, overseeing, managing, supporting, monitoring, using, acquiring, investing in, commercializing, and/or providing, among other things:

            1. models, algorithms, trading strategies, quantitative analytics, and other tools for or to support Trading;

            2. systems, technologies, and platforms for use in connection with Trading or Trading-related activities (including but not limited to order management, research, risk management, clearing, custody, and compliance);

            3. blockchain validation/mining; blockchain infrastructure-as-a-service; blockchain networks, protocols, chains, platforms, and tokens (collectively, "<u>Blockchain Projects</u>"); and systems and platforms for use in connection with Blockchain Projects;

            4. low latency computer hardware and software suitable for use in or to support Trading; and

            5. low latency telecommunications circuits, routes, services, and equipment suitable for use in or to support Trading.

DocuSign Envelope ID: A360913B-F973-4257-AFA2-20491F9DB5DD
Case: 1:25-cv-00703 Document #: 9-2 Filed: 01/21/25 Page 3 of 9 PageID #:107

CONFIDENTIAL



 b. The Group Companies trade on exchanges and other trading platforms and directly with counterparties located throughout the world, and due to the nature of the Group Companies' business, an individual's physical presence in a particular location is generally not necessary to be successful in such trading.

 c. Solely by virtue of my employment with the Company, I have acquired and/or will acquire confidential and/or proprietary information belonging to the Group Companies, and but for this association with the Company, I would not have had access or continue to have access to such confidential and/or proprietary information.

 d. The nature of my employment with the Company exposes or will expose me to confidential and/or proprietary information that is key to the Group Companies' competitive advantage and business and which would cause irreparable harm to the Group Companies if improperly used or disclosed.

2. **COVENANT NOT TO COMPETE.**

 a. I agree to not to engage directly or indirectly in Competitive Activity, including assisting another to engage in Competitive Activity, at all times during my employment with the Company and during the Noncompete Period.

 b. I understand and agree that if I fail timely to comply with any notice obligations I have under this Agreement or under the Confidential and/or Proprietary Information Agreement that such failure shall extend, on a day-for-day basis, the time within which the Company must or may act in response to such required notice.

 c. "<u>Competitive Activity</u>" means engaging in or doing any of the following:

  i. Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that is engaged in any aspect of the Business of the Group Companies where my role is, or is expected to be, a Similar Role;

  ii. Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that engages in Trading where my role is, or is expected to be, a Similar Role;

  iii. Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that designs, develops, builds, or invests in goods, services, or resources particularly suited for or designed for use in connection with Trading where my role is, or is expected to be, a Similar Role;

  iv. Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that directly or indirectly markets, sells, leases, or provides goods, services, or resources to any Group Company particularly suited for or designed for use in connection with any aspect of the Business of the Group Companies (a "<u>Vendor</u>") where I had access to confidential information regarding the absolute or relative value of the goods, services, or resources provided by or planned to be provided by the Vendor to any Group Company and where my role is, or is expected to be, either a Similar Role or a role where such confidential information would be useful in the performance of my job responsibilities;

DocuSign Envelope ID: A360913B-F973-4257-AEA2-20491F9DB5DD

CONFIDENTIAL



v. Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that is engaged in any aspect of the Business of the Group Companies in a role where confidential information I had access to would be useful in the performance of my job responsibilities;

vi. Engaging in, preparing to engage in, overseeing, or becoming a partner or principal in an entity that engages in Trading to the extent such activity is Related Activity;

vii. Engaging in any activity that constitutes part of the Business of the Group Companies to the extent such activity is Related Activity;

viii. Preparing to engage in any activity that constitutes the Business of the Group Companies to the extent such activity is Related Activity;

ix. Developing or overseeing the development of software or hardware platforms with direct or indirect application to Trading to the extent such activity is Related Activity;

x. Developing or overseeing the development of field-programmable gate arrays or application specific integrated circuits for use in Trading to the extent such activity is a Related Activity;

xi. Developing or overseeing the development of wired and/or wireless communications links for use in Trading to the extent such activity is Related Activity;

xii. Developing or overseeing the development of hardware, software, or telecommunications equipment for low-latency applications with direct or indirect application to Trading to the extent such activity is Related Activity;

xiii. Developing or overseeing the development of software or hardware for back office Trading operations including clearing, compliance, and risk management to the extent such activity is Related Activity;

xiv. Developing or overseeing the development of quantitative research platforms capable of use in Trading to the extent such activity is Related Activity;

xv. Developing or overseeing the development of simulation environments for Trading to the extent such activity is Related Activity;

xvi. Developing or overseeing the development of quantitative analytics for Trading to the extent such activity is Related Activity;

xvii. Developing or overseeing the development of analytical techniques, models, and strategies for pricing, price forecasting, market analysis, predictive modeling, event trading, book building, or alpha generation, for use in Trading to the extent such activity is Related Activity;

xviii. Developing or overseeing the development of analytical techniques, models, and strategies for arbitrage and statistical arbitrage, portfolio trading, or any other trading involving algorithmic or systematic strategies for Trading to the extent such activity is Related Activity; and

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

DocuSign Envelope ID: A360918B-F973-4257-AEA2-20491F9DB5DD

CONFIDENTIAL



      xix. Establishing or maintaining Counterparty relationships related to Trading or to the Business of the Group Companies to the extent such activity is Related Activity.

  d. "Developing" means designing, developing, utilizing, acquiring, testing, building, implementing, distributing, monitoring, maintaining, supporting, processing, creating, or assisting in the creation of.

  e. "Noncompete Period" means the zero (0) to twenty four (24) month period following the termination of my employment with the Company, as elected by the Company within ten (10) business days following the Separation Date (except as provided in Section 3 below). The date of my employment termination is the "Separation Date."

  f. "Related Activity" means activity similar to work I did, services I provided, expertise I used for the Company or any other Group Company, or activity to which confidential information to which I was exposed at the Company pertains.

  g. "Similar Role" means a role similar to my role at the Company in terms of the services I provide, the responsibilities I undertake, or the expertise I use.

  h. "Trading" means (i) trading any product, instrument or item that any Group Company traded or was preparing to trade during the period in which Employee was employed by the Company, or (ii) utilizing a trading strategy similar to any trading strategy used or planned to be used by any Group Company during the period in which Employee was employed by the Company and of which Employee was aware.

3. TEAM MEMBER NONCOMPETE.

  a. If during (i) my employment by the Company, (ii) the Noncompete Period elected by the Company upon the termination of my employment, or (iii) the six months following the end of the elected Noncompete Period, I:

    i. accept an offer for employment or consultancy at a company (or at a company that is under common control with a company) that I know, or would know upon reasonable inquiry of that company or Jump, employs a Former Team Member or for which a Former Team Member is providing consulting services or is retained to provide consulting services; or

    ii. enter into a formal or informal partnership or other business relationship with a Former Team Member;

in either case, where my work will involve engaging directly or indirectly in Competitive Activity, and (x) where I will work, I am reasonably expected to work, or I do work, on the same trading team or in the same department as such Former Team Member, or (y) where I will interact, I am reasonably expected to interact, or I do interact, directly or indirectly, in a material way with such Former Team Member, then my Noncompete Period shall be automatically extended by six (6) months (the "Team Member Noncompete Period Extension"), provided that in no event shall the Noncompete Period exceed twenty-four (24) months.

  b. I shall give notice to the Company within five (5) days of my triggering the requirements of Section 3(a). Such notice shall include the name and address of the new employer, consulting client, or partner(s); the date on which I expect to commence employment with the new

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

DocuSign Envelope ID: A360918B-F973-4257-AEA2-20491F9DB5DD
Case: 1:25-cv-00703 Document #: 9-2 Filed: 01/21/25 Page 6 of 9 PageID #:110

CONFIDENTIAL



employer, providing consulting services, or working on or for the partnership; a general description of the nature of my new employer's (or client's or partnership's) business and of my duties and responsibilities in connection therewith; the name(s) of Former Team Member(s) who cause Section 3(a) to apply; the nature of each such Former Team Member's duties and responsibilities at the new employer, client or partnership; and the name and business contact information of my direct supervisor at the new employer or client, if applicable.

    c. The Company may, in its sole discretion, waive some or all of the Team Member Noncompete Period Extension without payment obligation for any such waived period by providing notice to me within ten (10) business days following receipt of notice from me that I have triggered the requirements of Section 3(a).

    d. Noncompete Period Compensation for the Team Member Noncompete Period Extension that becomes due retroactively shall be paid in connection with the Company's next pay cycle following the expiration of the Company's waiver election period. By way of example, retroactive Noncompete Period Compensation for the Team Member Noncompete Period Extension could become due in circumstances such as the following: where two months after expiration of my original Noncompete Period I provide notice that I have accepted an offer of employment that triggers the extension in Section 3(a) and the Company does not waive the resulting Team Member Noncompete Period Extension.

    e. "Former Team Member" means any person who at any time during the twelve (12) month period immediately preceding the termination of my employment was a member of the same trading team or department (if I was not a member of a trading team) as I was at the Company.

4. **AT-WILL EMPLOYMENT; TERMINATION OF EMPLOYMENT; NONCOMPETE PERIOD COMPENSATION.**

    a. AT-WILL EMPLOYMENT. Employee and the Company understand and acknowledge that this Agreement does not alter the Parties' at-will employment relationship, as defined under applicable law, such that either party may terminate the relationship at any time for any reason or no reason. Regardless of the manner by which Employee's employment with the Company is terminated, including whether terminated by Employee or by the Company with or without Cause, such termination shall in no way affect, limit or alter Employee's continuing obligations under this Agreement including, without limitation, Employee's Covenant Not to Compete as set forth in Section 2 of this Agreement.

    b. NONCOMPETE PERIOD COMPENSATION. The Company will continue to pay me my current base monthly salary rate at the time of my Separation Date (the "Noncompete Period Compensation") during the Noncompete Period (including any Team Member Noncompete Period Extension), provided I do not engage in any Competitive Activity for the duration of the Noncompete Period. Payments under this subsection will be paid consistent with the Company's payroll schedule and will be subject to all applicable taxes.

    c. TERMINATION BY THE COMPANY FOR CAUSE. If the Company terminates the employment relationship for a reason constituting Cause as specified in Subsection 1(b) of the Confidential and/or Proprietary Information Agreement other than Subsections 1(b)(vi) or (vii) ("Serious Cause"), or if the employment relationship terminates for any reason and circumstances constituting Serious Cause existed at any time during the employment relationship and at the time of termination of the employment relationship the Company was unaware of, or had only recently become aware of, material facts underlying the existence of such Serious Cause,

CONFIDENTIAL



Employee acknowledges and agrees that Employee will not be entitled to, nor shall Employee receive from the Company, any Noncompete Period Compensation. If the Company terminates the employment relationship for Cause and such termination is solely for Cause(s) other than Serious Cause, then the Employee's entitlement to any Noncompete Period Compensation will not be affected. If the Company has commenced payment of Noncompete Period Compensation and thereafter determines that no such compensation was or is due in light of the existence of Serious Cause, then the Company shall notify the Employee of such determination and Employee shall promptly return all previously received Noncompete Period Compensation.

5. MODIFICATION BY TRIBUNAL.

    a. If a court or arbitration panel determines that the time and/or geographic restrictions imposed upon me as set forth in Section 2 and/or 3 of this Agreement are unenforceable in part, such court or arbitration panel may (and is hereby requested to) modify this Agreement so as to impose upon me such restrictions of time and geographic scope as the court or arbitration panel shall find reasonable and proper under the circumstances. All remaining provisions of this Agreement not modified by the court or arbitration panel shall remain in full force and effect.

    b. If a court or arbitration panel determines that the time and/or geographic restrictions imposed upon me as set forth in Section 2 of this Agreement are void or unenforceable in their entirety, all obligations of the Company to make any payment to me during the Noncompete Period pursuant to Section 4(b) above will terminate.

6. NOTICE OF FUTURE EMPLOYMENT. In addition to fulfilling the notice obligations that are incorporated into this Agreement below, I will notify the Company in writing on or before the last day of my employment (i) of any offers of employment that I have accepted and/or that I have received and not declined, and/or (ii) if I am quitting my job with the intent to accept or commence work at one or more specific companies (even if I do not have an offer of employment), and/or (iii) if I intend to engage in any other new business activities. If any of (i), (ii), and/or (iii) is applicable, my notice to the Company with respect to each such item shall include, the name and address of the prospective employer and/or the nature of the expected new business activities (as applicable), the date on which I expect to commence such job or activities, a general description of the nature of my prospective employer's business and of my expected job duties and responsibilities with such prospective new employer. If I fail to provide such notice or if I am not truthful in such notice, the Company shall have ten (10) days from notice of my violation to elect a new Noncompete Period of up to the longest period that the Company could have elected under Section 2(e).

7. REASONABLE TERMS. I understand that the provisions of this Agreement will limit my ability to earn a livelihood in an identical or similar business for the duration of the Noncompete Period. I understand the global nature of Group Companies' business and the efforts the Group Companies undertake to develop, preserve, and protect its business and competitive advantage. In light of the need to protect the Group Companies' competitive position and confidential and proprietary information, I agree that the scope and duration of the restrictions and limitations contained in this Agreement are reasonable to protect the legitimate business interests of the Group Companies. I further acknowledge that these restrictions apply regardless of the reason for the termination of my employment relationship with the Company.

8. BREACH. If I materially breach any provision of this Agreement, such breach by me shall constitute a forfeiture of all compensation and benefits to me set forth herein. In the event any such compensation or benefits have already been conveyed to me as of the time of my breach, I agree to immediately

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

CONFIDENTIAL



return and/or repay the same to the Company, including any and all taxes withheld by the Company and paid on my behalf. In addition, if I breach Section 2 or 3 of this Agreement, the Noncompete Period shall be extended by a period of time equal to that period beginning when such breach commences and ending when the activities constituting such breach terminate. In addition, I agree to the destruction of any work product created by me during any period in which I was in violation of Section 2 or 3 of this Agreement. This provision does not replace or limit any other remedies set forth or incorporated herein or that the Company may have at law or in equity, including monetary damages.

9. ILLINOIS FREEDOM TO WORK ACT. Notwithstanding anything to the contrary in this Agreement, if as of the Effective Date Employee's actual or expected annualized rate of earnings does not exceed the applicable threshold amount mandated by the Illinois Freedom to Work Act, 820 ILCS 90/10 (the "Minimum Earnings Threshold"), the obligations contained in Sections 2 and 3 of this Agreement (the "Noncompete Covenants") shall be inapplicable to Employee. The Noncompete Covenants shall only apply to and bind Employee from and after the date on which Employee's actual or expected annualized rate of earnings does exceed the applicable Minimum Earnings Threshold.

10. INCORPORATION OF TERMS SET FORTH IN THE CONFIDENTIAL AND/OR PROPRIETARY INFORMATION AGREEMENT. In connection with Employee's employment by the Company, Employee has signed or will sign an agreement titled Confidential and/or Proprietary Information Agreement. The following provisions set forth in the Confidential and/or Proprietary Information Agreement are incorporated herein by reference and form a part of this Agreement:

    a.  Section 9 pertaining to "Notification of Obligations";

    b.  Section 10 pertaining to "Dispute Resolution, Law and Jurisdiction" (including, without limitation, the choice of applicable law, the agreement to arbitrate disputes between us except where it is not lawful to require arbitration, the waiver of trial by jury, and the potential for the Company to obtain emergency relief in court); and

    c.  Section 12 pertaining to "General Provisions."

11. VOLUNTARY ACCEPTANCE. By signing this Agreement, I acknowledge that:

    a.  This Agreement has been written in understandable English;

    b.  I have carefully read and fully understand all provisions of this Agreement;

    c.  I knowingly and voluntarily agree to all of the terms set forth in this Agreement;

    d.  I knowingly and voluntarily agree to be legally bound by this Agreement;

    e.  I have signed this Agreement of my own free will and without duress or constraint and without representations not expressly set forth herein and not relying on any asserted duty or obligation by the Company or any other person to disclose information in connection herewith;

    f.  I understand that I am entitled to 14 days within which to review this Agreement and decide whether to enter into it; and

    g.  I understand that the Company recommends that I seek the advice of independent legal counsel in connection with this Agreement and I confirm that I have had the opportunity to consult with independent legal counsel before signing this Agreement.

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

DocuSign Envelope ID: A360913B-F973-4257-AEA2-20491F9DB5DD

**CONFIDENTIAL**



AGREED TO AND ACCEPTED BY:

| Jump Operations, LLC | Liam Heeger |
|---|---|
| By: *Emily Whalen* | By: *liam Heeger* |
| | Signature |
| Emily Whalen | |
| Date: 25 January 2023 | Date: 31 January 2023 |

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654