# EXHIBIT D



# CONFIDENTIAL AND/OR PROPRIETARY INFORMATION AGREEMENT

This Confidential and/or Proprietary Information Agreement (the "Agreement") is entered into as of 31 January 2023, by and between Jump Operations, LLC (the "Company" or "Jump"), and Liam Heeger ("me", "I", or "Employee").  The Company and I are each a "Party" and collectively the "Parties." The Company and every entity under direct or indirect Common Ownership or Control with the Company at the relevant time, is each a "Group Company" and collectively they are "Group Companies." "Common Ownership or Control" exists with respect to two entities where there is an overlap of at least 50.1 percent of the direct or indirect ownership or control of the equity or voting interests of each entity. Any capitalized terms used and not defined in this Agreement shall have the respective meanings given to them in the Offer Letter.

As a condition and in consideration of my becoming employed (or my employment being continued) by the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1. EMPLOYMENT RELATIONSHIP.

    a. AT-WILL EMPLOYMENT. I understand and acknowledge that this Agreement does not change my status as an employee at-will or otherwise alter, amend or expand upon any rights I may have to continue in the employ of the Company under any existing agreements between the Company and me or under applicable law.  Any employment relationship between the Company and me, whether commenced prior to, upon, or after the date of this Agreement, shall be referred to herein as the "Relationship" or "my Employment."

    b. CAUSE. For the purposes of the Employment Related Agreements, "Cause" shall exist, such that the Company may terminate Employee's employment for Cause, if Employee:

        i. commits a material breach of any term of this Agreement or of any of the other Employment-Related Agreements;

        ii. commits acts constituting, is convicted of, or enters a plea of guilty or nolo contendere to (A) a misdemeanor involving dishonesty, fraud or moral turpitude, or (B) a felony, provided in each case that the Company determines that your termination for such offense is permitted by applicable law;

        iii. engages in conduct involving fraud, misrepresentation, dishonesty, or disloyalty in the discharge of his duties and responsibilities hereunder;

        iv. engages in willful or grossly negligent conduct that is materially injurious, monetarily or otherwise, to any Group Company (for the avoidance of doubt, trading losses that are not the result of willful misconduct shall not constitute Cause);

        v. commits a material violation of written Company policy concerning compliance with applicable law (including, for the avoidance of doubt, regulations and rules of self-regulatory organizations), information security, the protection of confidential information, or cooperation in connection with investigations;

        vi. fails as a result of willful or grossly negligent conduct, for reasons other than disability, to substantially perform any of his duties or obligations, provided that if such failure is



      curable, Employee shall be provided written notice and a period of five (5) business days to cure such failure; or

   vii. engages in conduct tending to bring any Group Company into disrepute.

Without limiting the foregoing, the commission of any of the following acts shall constitute grounds to terminate Employee's employment for Cause:

   i. for the benefit of any person other than a Group Company, Employee accessing or attempting to access, copying or attempting to copy, or transferring or attempting to transfer, or sharing or attempting to share, any files or data on or from any Group Company database or computer system (whether or not Employee otherwise has authorization to access such information for Group Company purposes); notwithstanding the foregoing, nothing herein shall prohibit Employee from making immaterial personal use of a Group Company computer system in a manner that is in compliance with the IT Acceptable Use Policy and all other written Group Company policies and all applicable laws and regulations where such use is limited to accessing or transferring information pertaining to Employee's personal life only, such as Employee accessing or transferring information about a personal social dinner reservation or a personal utility bill;

   ii. for the benefit of any person other than a Group Company, Employee photographing, screenshotting, otherwise recording any Confidential Information;

   iii. Employee providing assistance directly or indirectly to any recruiter, competitor, or other potential employer in their efforts to Solicit (as defined in the Nonsolicitation Agreement) any Group Company employee other than Employee (including to obtain information reasonably likely to be helpful in identifying recruitment candidates or otherwise Soliciting);

   iv. Employee attempting to defeat or circumvent any information security polices or measures in place or believed by Employee to be in place at any Group Company; or

   v. Employee taking any action to hide Employee's activities in searching any Group Company database or computer system or in downloading, copying, or transferring any information from any Group Company database or computer system.

2.   CONFIDENTIAL AND/OR PROPRIETARY INFORMATION. I understand that for the purposes of this Agreement, "Confidential and/or Proprietary Information" means all information that is not publicly known pertaining to any aspect of the Group Companies' business. This includes any Group Company's current business and plans, prior business and plans, and future and/or contemplated business and plans, whether in tangible or intangible form. By way of example only, and without limitation, the covered information includes technical data; trading methods; trading positions; procedures; investment techniques; strategies; trade secrets and know how; research; product plans; equipment plans and designs; business plans; products; services; suppliers; counterparties; investors; prices; costs; markets; software; code; algorithms; developments; inventions; laboratory notebooks; processes; formulas; technology; designs; drawings; engineering; hardware configuration information; marketing; licenses; finances; budgets; the identities, roles, and compensation of employees; the identities of trading team and department members; the profitability and other performance

DocuSign Envelope ID: A360918B-E973-4257-AEA2-30491F9DB5DD



characteristics of trading teams, the Company and the Group Companies overall, and any subdivision thereof; and other business information.  Confidential and/or Proprietary Information includes information created by me during the Relationship, whether or not during working hours.  But Confidential and/or Proprietary Information does not include any information that has become publicly and widely known and made generally available through no wrongful act of mine or anyone with whom I have acted or am acting in concert.

   a. USE OF CONFIDENTIAL AND/OR PROPRIETARY INFORMATION.  I understand that the services I will render to the Company are of a special, unique, extraordinary and intellectual character and my position with the Company places me in a position of confidence and trust.  Further, the rendering of service by me necessarily requires the Group Companies to disclose Confidential and/or Proprietary Information to me.  I understand that the Group Companies' industry is highly competitive and that the competitors in this industry derive significant value from Confidential and/or Proprietary Information.  The Group Companies have devoted considerable resources in developing their Confidential and/or Proprietary Information, and such Confidential and/or Proprietary Information, as well as all other information relating to the Group Companies' activities that is not generally known outside of the Group Companies, is key to the Group Companies' competitive advantage and business.  Any loss or erosion of the Group Companies' competitive advantage through the disclosure or improper use of its Confidential and/or Proprietary Information could have severe repercussions on the Group Companies' business.  I agree, subject to Section 6 below, at all times during the term of my Relationship with the Company and thereafter, regardless of the reason or lack of reason for termination of the Relationship: (i) to hold Confidential and/or Proprietary Information in strictest confidence;  (ii) except for the benefit of the Group Companies during the Relationship, not to use or to disclose to any person, firm, corporation or other entity any Confidential and/or Proprietary Information without the written authorization of the Company; (iii) except for the benefit of the Group Companies during the Relationship, not to make copies of  Confidential and/or Proprietary Information or remove such information from any Group Company's premises, either physically or electronically, without express, written permission from the Company; and (iv) notwithstanding any other provision in this subsection, not to remove or send (either physically or electronically) any computer code from any Group Company's premises or out of any Group Company's computer systems (for example and without limitation, by emailing it out of the Company or uploading it to non-Company cloud storage) regardless of the reason for doing so.  I agree to immediately notify the Company of any unauthorized disclosure or use of any Confidential and/or Proprietary Information of which I become aware. I agree not to reference on social media or on any publicly available website the internal name of any trading team or department (i.e., a team or department name that the Company does not publicly advertise) without the Company's permission.

   b. COMPELLED DISCLOSURE.  The foregoing restrictions shall not prevent me from disclosing information that I am obligated to disclose pursuant to the requirements of a governmental agency or by law.  But prior to any such disclosure and promptly upon becoming aware of the request or obligation, I must notify the Company of the contemplated disclosure and undertake, at the Company's expense, and cooperate in, all reasonable efforts to prevent the disclosure and otherwise protect the confidentiality of the information.

   c. INFORMATION BELONGING TO OTHERS. I represent and warrant that I have not violated and will not violate confidentiality obligations owing to others.  In particular:

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654



i. I represent that the performance of my responsibilities as an employee of the Company have not breached and will not breach any agreement or obligation to keep in confidence confidential and/or proprietary information belonging to any other person, including any previous employer or client. For the avoidance of doubt, I will not disclose to any Group Company, use on its behalf, or induce or cause any Group Company to use, any confidential and/or proprietary information belonging to any previous employer, client or any other person.

ii. I recognize that the Group Companies have received and in the future will receive from third parties their confidential and/or proprietary information subject to a duty on the Group Companies' part to maintain the confidentiality of such information and to use it only for certain limited purposes. Subject to Section 6 below, I agree to hold all such confidential and/or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with any Group Company's agreement with such third party.

3. CREATIVE WORKS RETAINED AND LICENSED.

   a. CREATIVE WORKS. "Creative Works" include, but are not limited to, all original works of authorship, inventions, discoveries, designs, computer hardware and software, algorithms, programming, scripts, applets, databases, database structures, or other confidential and/or proprietary information, business ideas, and related improvements and devices, which were or are conceived, developed, or made by me, either alone or with others.

   b. PRIOR CREATIVE WORKS. Attached hereto, as Exhibit A, is a list describing with particularity all Creative Works which were made prior to the commencement of the Relationship (collectively referred to as "Prior Creative Works"), which belong solely to me or belong to me jointly with another, which relate in any way to any of the Group Companies' businesses or proposed businesses, products or research and development, and which are not assigned to the Company, or its designee, hereunder. Or, if no such list is attached, I represent that there are no such Prior Creative Works. If, in the course of my Relationship with the Company, I incorporate (or provide to any Group Company for incorporation) into any Group Company software, code, product, process or machine a Prior Creative Work owned by me or in which I have an interest, the applicable Group Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Creative Work as part of or in connection with such software, code, product, process or machine and I represent that I have the right and authority to grant the foregoing license.

   c. ASSIGNMENT OF CREATIVE WORKS. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Creative Works that I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the Relationship, except as provided in this subsection. I agree not to, at any time, assert any claim, ownership, or other interest in any of such Creative Works. I further acknowledge that all Creative Works that are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company are "works made for hire" (to the greatest extent permitted by

CONFIDENTIAL



applicable law) and are compensated by my salary, unless regulated otherwise by the mandatory law of the state of Illinois. Pursuant to the Employee Patent Act, Illinois Public Act 83-493, the Company has hereby informed me that the provisions of this subsection will not apply to any inventions for which no equipment, supplies, facilities or trade secret information of any Group Company were used and which were developed entirely on my own time, unless (1) the invention relates (i) to the business of a Group Company, or (ii) to actual or demonstrably anticipated research or development of a Group Company, or (2) the invention results from any work performed by me for a Group Company.

d. MAINTENANCE OF RECORDS. I agree to keep and maintain adequate and current written records of all Creative Works made during my Relationship with the Company. If the Company adopts a standard methodology or format for such records or portions thereof, I agree to maintain said records in the standard format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's premises except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.

e. PATENT AND COPYRIGHT RIGHTS. Both during and after the Relationship, I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's or any Group Company's rights in the Creative Works made during the Relationship and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company shall deem necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Creative Works, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of the Relationship until the expiration of the last such intellectual property right to expire in any country of the world. If the Company is unable because of my mental or physical incapacity or unavailability or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Creative Works assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent or copyright registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to the Company any and all claims, of any nature whatsoever, which I now or hereafter have for infringement of any and all proprietary rights assigned to the Company or any Group Company.

4. REMOVAL AND RETURN OF COMPANY PROPERTY. Subject to Section 2 above and Section 6 below, which control over anything to the contrary in this section, I agree not to remove any property of any Group Company, including, but not limited to, any Confidential and/or Proprietary Information, from any Group Company's premises at any time, without the prior written approval of the Company (for the avoidance of doubt, Group Company laptop computers and mobile devices that have been issued to an employee for purposes of conducting the Group Companies' business may be removed from the

**CONFIDENTIAL**



Group Companies' premises but only for purposes of conducting business on behalf of the Group Companies). Unless specifically authorized by the Company in writing, I understand that I may not place any Group Company property on Removable Media, as defined below. I agree that, at the time of termination of my Relationship with the Company or and at any time on demand by the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all Group Company property, including, but not limited to, any Confidential and/or Proprietary Information, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents (whether or not they are confidential) or property, or reproductions or summaries of any aforementioned items developed by me pursuant to the Relationship or otherwise belonging to any Group Company, its successors or assigns or provided to a Group Company by third parties. I further agree that any property situated on any Group Company's premises or owned by any Group Company (including computers, mobile devices, disks and other storage media, filing cabinets, or other physical or electronic storage and work areas), is subject to inspection by Company personnel at any time with or without notice. As used herein, "Removable Media" means portable or removable hard disks, floppy disks, USB memory drives, zip disks, optical disks, CDs, DVDs, digital film, memory cards (e.g. Secure Digital (SD), Memory Sticks (MS), CompactFlash (CF), SmartMedia (SM), MultiMediaCard (MMC), and xD-Picture Card (xD)), magnetic tape, and all other removable data storage media.

5. NONDISPARAGEMENT. During the Relationship and following the termination of the Relationship for any reason, whether with or without Cause, subject to Section 6 below, I shall not make any oral or written statement to any third party that disparages, defames, or reflects adversely upon any Group Company, or any Group Company's principals, officers, employees, members, shareholders, or services.

6. PROTECTED RIGHTS.

    a. NOTICE OF IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING. Notwithstanding anything herein to the contrary, pursuant to the Federal Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the Defend Trade Secrets Act of 2016.

    b. PERMITTED DISCLOSURES. I understand that nothing in this agreement shall limit my ability to: report allegations of unlawful conduct to government officials for investigation; testify pursuant to a court order, lawful subpoena, or written request from a government agency; or make truthful disclosures regarding alleged unlawful discrimination, harassment or retaliation.

7. OPEN SOURCE SOFTWARE. I will incorporate Open Source Software in Group Company software, code, products, processes or machines only in accordance with the Company's written Open Source Software policy. For purposes of this provision, "Open Source Software" means any software, programming, or other intellectual property that is subject to (i) the GNU General Public License, GNU

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

DocuSign Envelope ID: A360918B-E973-4257-AEA2-30491F9DB5DD



Library General Public License, Artistic License, BSD license, Mozilla Public License, or any similar license, including, but not limited to, those licenses listed at www.opensource.org/licenses or (ii) any agreement with terms requiring any intellectual property owned or licensed by any Group Company to be (a) disclosed or distributed in source code or object code form; (b) licensed for the purpose of making derivative works; or (c) redistributable.

8. REPRESENTATIONS AND COVENANTS.

    a. FACILITATION OF AGREEMENT.  I agree to execute promptly any proper oath or assignment and/or verify any proper document required to carry out the terms of this Agreement upon the Company's written request to do so.

    b. CONFLICTS.  I am under no contractual or other restrictions or obligations that are inconsistent with the execution or performance of this Agreement including any that will interfere with the performance of my duties on behalf of the Company and I will not enter into any agreement in conflict with any of the provisions of this Agreement.

9. NOTIFICATION OF OBLIGATIONS.

    a. NOTIFICATION PERIOD.  For purposes of this Agreement "<u>Notification Period</u>" means the period beginning when my Employment ends and continuing until the later of the date that is (x) twenty-four (24) months after the end of my Employment and (y) twelve (12) months after the conclusion of my Noncompete Period (as defined in the Noncompete Agreement).

    b. NOTIFICATION TO NEW EMPLOYERS.  During the Notification Period, I (x) will notify any new employers or other parties with whom I enter consulting relationships of my obligations under the Employment-Related Agreements prior to commencing employment with such new employers or commencing the consulting relationship(s); and (y) consent to notification by the Company to my new employers and consulting clients about my obligations under this Agreement. For the avoidance of doubt, nothing in this paragraph shall limit the duration of my confidentiality obligations.

    c. NOTICE OF FUTURE EMPLOYMENT.  During my Employment by the Company and during the Notification Period, I agree to notify the Company a minimum of ten (10) days prior to beginning employment with any new employer and within no more than five (5) days after accepting (whether formally or informally) an offer of employment.  I will provide written notice to the Company with the name and address of the new employer, the date on which I expect to commence employment with the new employer, a general description of the nature of my new employer's business and of my job duties and responsibilities with the new employer, and the name and business contact information of my direct supervisor at the new employer.

    d. NOTICE OF CONSULTING RELATIONSHIPS.  During my Employment by the Company and during the Notification Period, I agree to notify the Company a minimum of ten (10) days prior to beginning any new consulting relationship.  I will provide written notice to the Company with the name and address of the consulting client (including the ultimate client if there is an intermediary), a general description of the nature of the client's business and of my consulting responsibilities for the client, and the name and business contact information of my primary contact at the client.

10. DISPUTE RESOLUTION, LAW AND JURISDICTION.

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

**CONFIDENTIAL**



a. **GOVERNING LAW.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Illinois, without giving effect to the principles of conflict of laws.

b. **REMEDIES.** I recognize and understand that a breach of any terms contained in this Agreement would cause immediate and irreparable injury to the affected Group Company for which there may be no adequate remedy at law. If I have breached or threaten to breach any provision of this Agreement, the applicable Group Company shall be entitled to obtain emergency, temporary and/or preliminary relief and enforcement of this Agreement in any court or arbitration forum of competent jurisdiction by means of a decree of specific performance, an injunction, and/or any other form of equitable relief without the necessity of posting a bond in connection with any relief sought or granted. This provision does not replace or limit any other remedies set forth herein or that the applicable Group Company may have at law or in equity, including monetary damages and this provision should be read in conjunction with Section 10(c) below.

c. **ARBITRATION: All claims or controversies arising out of or relating to this Agreement or the Relationship shall be subject to and resolved by binding arbitration in accordance with the Federal Arbitration Act ("FAA"). Such arbitration shall be administered by the American Arbitration Association in accordance with its Employment Arbitration Rules, unless a regulatory agency or other governing body with jurisdiction over the matter provides for mandatory arbitration in another forum. Notwithstanding the foregoing, and as indicated in Section 10(b) above, this agreement to arbitrate shall not preclude any Group Company from bringing in court any claim for emergency, temporary and/or preliminary relief and enforcement of this Agreement. This agreement to arbitrate shall not apply to any claim that cannot be subject to mandatory arbitration under applicable law (which may include claims of discrimination, harassment, or retaliation under Illinois and New York law, unless preempted by the FAA). Any arbitration will be conducted in Chicago, Illinois (except that if Employee's last primary Company work location is or was in a Company office outside of Illinois, then the arbitration shall be held in the city in which that Company office is located), and judgment on the arbitration award may be entered in any court having jurisdiction thereof. This provision does not preclude Employee from filing a charge or claim with an administrative agency or regulatory body; provided, however, that Employee waives any right to recover damages in such a proceeding and acknowledges that any monetary remedy or other individual relief can be obtained solely through arbitration. EXCEPT AS PROVIDED HEREIN, THE PARTIES HEREBY AGREE TO WAIVE THE RIGHT TO SUE EACH OTHER IN COURT. IN ALL INSTANCES, THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY.**

d. **EXPENSES:** In addition to any and all other remedies available at law or in equity in any lawsuit or arbitration hereunder, the Prevailing Party in any lawsuit or arbitration related to this Agreement will be entitled to recover all reasonable costs and expenses, including reasonable legal fees, incurred in connection with such dispute, in addition to all other remedies available at law or in equity. The following factors shall be included in this analysis.

   i. The "Prevailing Party" will be the Party that is determined by the court or arbitrator to have prevailed on one or more claims that were the main claims at issue in the dispute. More specifically, to be found to be the Prevailing Party, a Party must (i) if monetary

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

DocuSign Envelope ID: A360918B-E973-4257-AEA2-20491F9DB5DD
Case: 1:25-cv-00703 Document #: 9-4 Filed: 01/21/25 Page 10 of 13 PageID #:127

CONFIDENTIAL



      damages are awarded, be awarded more than a nominal amount, and/or (ii) if injunctive relief is granted, be provided relief similar to the relief requested by the Party.

    ii. The determination of whether costs and expenses are reasonable shall include consideration of the reasonableness of the amount of expenses incurred following the rejection of any settlement offer(s) in light of a comparison between the amount awarded and/or the equitable relief granted and the amount that would have been awarded and/or the equitable relief that would have been granted had the settlement offer(s) been accepted.

  The Parties expressly acknowledge that the court or arbitrator could determine that neither Party is a Prevailing Party, in which case neither Party will be entitled to recover costs or expenses.

  e. JURISDICTION. I HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENT TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES OF AMERICA AND (SUBJECT TO THE ARBITRATION LOCATION REQUIREMENTS CONTAINED IN SECTION 10.c. ABOVE) TO THE JURISDICTION OF THE RELEVANT ARBITRAL FORUM LOCATED IN COOK COUNTY IN THE STATE OF ILLINOIS FOR ANY ACTION, SUIT, ARBITRATION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF MY PRIMARY WORK LOCATION WAS OR IS IN A COMPANY OFFICE OUTSIDE OF ILLINOIS, I ALSO HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENT TO THE JURISDICTION OF THE COURTS OF THAT STATE AND TO THE JURISDICTION OF THE RELEVANT ARBITRAL FORUM LOCATED IN THE COUNTY IN WHICH SUCH OFFICE IS LOCATED FOR ANY ACTION, SUIT, ARBITRATION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. I WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION, SUIT, ARBITRATION OR PROCEEDING IN ANY SUCH COURTS AND WAIVE AND AGREE NOT TO PLEAD OR CLAIM THAT ANY SUCH ACTION, SUIT, ARBITRATION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR FORUM HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

11. DATA PROTECTION ACT NOTICE AND RECORDKEEPING.

  a. DATA PROTECTION ACT NOTICE. The Company will use your information together with other information for employment administration, payroll purposes, and business needs. By executing this Agreement, you give your consent to the Company to process your information, including sensitive personal data such as health data as well as identification information such as is needed for anti-money-laundering and know-your-customer/counterparty disclosures and assessments, whether obtained from you or from another source, for the above purposes. You also consent to our transferring information to countries and subdivisions of countries that do not provide the same level of data protection as this jurisdiction if necessary for the above purposes. This does not affect your non-waivable rights or the Company's obligations and responsibilities under all applicable data protection laws.

  b. RECORDKEEPING/ SECURITY AND INTERNET. You acknowledge that the Company may, for lawful business purposes, monitor, check, record, and review communications carried out using the Company's telecommunications and computer systems, including telephone calls, emails, chat, and internet use. You consent to the Company monitoring, checking, recording, and reviewing telephone calls, internet use, computer files, e-mails, chats, and other records and performing any other compliance, security or risk analysis checks the Company is obligated to

DocuSign Envelope ID: A360918B-E973-4257-AEA2-20491F9DB5DD

CONFIDENTIAL



conduct or considers reasonably necessary and you further consent to the Company's reasonable recordkeeping regarding this monitoring including maintaining an archive of all electronic files for lawful business purposes, including as required by law.

12. GENERAL PROVISIONS.

   a. ENTIRE AGREEMENT.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior agreements, discussions, understandings, or representations, either oral or in writing, relating to this subject matter; except that, for the avoidance of doubt, the Offer Letter, the Confidential and/or Proprietary Information Agreement, the Noncompetition Agreement, and the Nonsolicitation Agreement executed by the Company and me shall each remain in full force and effect and shall co-exist with each other.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Party to be charged.   There are no oral statements, representations, inducements, warranties, or undertakings modifying or affecting the terms set forth herein.

   b. SEVERABILITY AND ENFORCEMENT.  Without limiting any more specific language that may exist herein regarding modification of specific provisions by the tribunal, whenever possible, each provision of this Agreement shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision or portion thereof shall be held to be prohibited or invalid under applicable law, such provision or portion thereof shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting the remainder of such provision or any of the remaining provisions of this Agreement.  In addition, the Parties hereby agree and request that if a court or arbitration panel determines that any provision or portion thereof is prohibited or invalid that the court or arbitration panel reform or replace such prohibited or invalid provision or portion thereof with a valid and enforceable provision or portion that comes as close as possible to expressing the intention of the prohibited or invalid provision or portion.

   c. SURVIVAL.  The provisions of this Agreement shall survive the termination of the Relationship and the assignment of this Agreement by the Company to any successor in interest or other assignee.

   d. SUCCESSORS AND ASSIGNS.  Employee may not assign any of Employee's rights or delegate any of Employee's obligations hereunder without the prior written consent of the Company. The Company may assign its rights or delegate its operations to any Group Company. Any purported assignment or delegation in violation of this Section shall be null and void. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

   e. THIRD PARTY BENEFICIARIES.  I acknowledge that each Group Company is a third party beneficiary of this Agreement and may enforce its and the Company's rights under this Agreement and that the Company may enforce the rights of any Group Company hereunder in addition to its own rights.

   f. CONSTRUCTION.  The various titles of the sections herein are used solely for convenience and shall not be used for interpreting or construing any word, clause, section, subsection, paragraph, or subparagraph of this Agreement.  The language used in this Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654



    construction shall be applied against any Party. In the event of any ambiguity in or dispute regarding the interpretation of this Agreement and the terms set forth herein, this Agreement shall not be construed against any Party, both of which shall be deemed to have drafted this Agreement.

  g. NOTICES. All notices, demands or other communications ("<u>Notices</u>") to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and may be delivered by any reasonable means, including e-mail, except that all notices to the Company must be sent via e-mail even if another method of delivery is also employed. Notices shall be delivered to the addresses set forth below, or such other addresses as shall be given by notice delivered hereunder. Notices sent in hard copy shall be deemed to have been delivered and shall be effective upon actual delivery. Delivery via e-mail shall be deemed to have occurred and shall be effective one minute following the time of sending as stated in the sender's e-mail records provided that the e-mail was properly addressed and that no "bounce-back" message is received by the sender from the recipient's e-mail server within 24 hours of the time of sending indicating that delivery was not successful. Notwithstanding the foregoing, Notices delivered to the Company outside of normal business hours shall be deemed to be received on the next regular business day.

<u>If to the Company</u>:

Attn: Legal Department
Jump Operations, LLC
600 W. Chicago Ave., Suite 600
Chicago, IL 60654
E-mail:
separations@jumptrading.com

<u>If to the Employee</u>:

To Employee's last known address, including e-mail address, as provided in their personnel file.

  h. COUNTERPARTS; DELIVERY. This Agreement, and any amendments hereto, may be executed by each of the Parties on identical counterparts, including counterparts sent by facsimile or by e-mail in PDF or similar format, any and all of which may contain the signature of less than all of the Parties, and all of which shall be construed together as a single instrument and shall have the same effect as if the Parties had signed the same copy. At the request of any Party, the other Party hereto will re-execute original forms thereof and deliver them to the other Party. No Party hereto will raise the use of a facsimile machine or e-mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or e-mail as a defense to the formation or enforceability of a contract and each such Party forever waives any such defense.

13. VOLUNTARY ACCEPTANCE. By signing this Agreement, I acknowledge that:

  a. This Agreement has been written in understandable English;

  b. I have carefully read and fully understand all provisions of this Agreement;

  c. I knowingly and voluntarily agree to all of the terms set forth in this Agreement;

  d. I knowingly and voluntarily agree to be legally bound by this Agreement;

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654

CONFIDENTIAL



e. I have signed this Agreement of my own free will and without duress or constraint and without representations not expressly set forth herein and not relying on any asserted duty or obligation by the Company or any other person to disclose information in connection herewith; and

f. I understand that the Company recommends that I seek the advice of independent legal counsel in connection with this Agreement and I confirm that I have had the opportunity to consult with independent legal counsel before signing this Agreement.

AGREED TO AND ACCEPTED BY:

Jump Operations, LLC

By: *Emily Whalen*

Emily Whalen

Date: 25 January 2023

Lia̶̶̶̶̶̶

By *liam Heeger*

Date: 31 January 2023

**Jump Operations, LLC**
600 West Chicago Avenue · Suite 600 · Chicago, Illinois 60654