**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUMP OPERATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 25-cv-703 |
| v. | ) | |
| | ) | |
| LIAM HEEGER, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Jump Operations, LLC ("Plaintiff" or "Jump"), by and through its undersigned attorneys, brings this Complaint against Defendant Liam Heeger for preliminary injunctive relief. In support thereof, Jump states as follows:

## PRELIMINARY STATEMENT

1.      Defendant Liam Heeger is a former Jump employee who recently quit and is now running a competitive business in direct violation of his noncompetition agreement. Jump seeks a preliminary injunction to prevent Heeger from (a) competing against Jump and its affiliates in violation of his contractual non-competition obligations and (b) using or disclosing Jump's confidential and proprietary information, including any intellectual property that Heeger developed while he was a Jump employee, in violation of his confidentiality and intellectual property assignment obligations.

2.      Heeger was employed at Jump as a software engineer on a highly sophisticated and sensitive project of the Jump Trading Group of affiliated entities ("JTG") relating to Jump's development of blockchain technology, which supports cryptocurrencies and other digital assets.

He is now engaged in a directly competing venture. For ease of reference, when referring to the business of JTG herein, the term "Jump" will be used.

3.      Under his Non-Competition Agreement, Heeger agreed that he would not compete with Jump during his employment and for a period of up to two years after his employment, which ended when he resigned on November 11, 2024.

4.      Heeger is also party to related employment agreements with Jump, including a Confidential and/or Proprietary Information Agreement, which bars him from using confidential or proprietary Jump information during and after his employment for the benefit of anyone other than Jump.[1]

5.      But notwithstanding his agreements, and the fact that Jump continues to pay Heeger an annual salary of $200,000, or roughly $16,667 per month to honor his post-employment non-competition obligations, Heeger has launched a new blockchain development venture that directly competes with Jump. Heeger's creation of, and work on behalf of, this venture, which according to Heeger's own admissions, had already secured $3 million in funding at a $50 million valuation within one month of Heeger's resignation (and potentially earlier), constitutes a direct violation of his contractual non-compete obligations.

6.      Heeger does not deny that he signed the non-compete or that it was valid when signed. Instead, he has told his former Jump supervisor that ***he has determined that he is no longer required to comply with his non-compete obligations*** because he has moved to California.

7.      Furthermore, it appears that Heeger started work on this competing venture ***while he was still an employee of Jump*** and is now exploiting Jump's Confidential and/or Proprietary

---

[1] The term "Employment Agreements" is used throughout to refer to Heeger's Non-Competition Agreement, Non-Solicitation Agreement, Offer Letter, and Confidential and/or Proprietary Information Agreement.

Information, including intellectual property he created while an employee of Jump, for the benefit of this new enterprise and to the detriment of Jump. Under the Confidential and/or Proprietary Information Agreement, Heeger agreed that all such intellectual property belongs to Jump, and his use of this intellectual property constitutes a direct violation of his contractual obligations.

8.  Heeger must be held accountable, and his unlawful conduct must cease. In the Non-Competition Agreement, Heeger agreed that breach of any terms contained in this Agreement would cause immediate and irreparable injury to Jump and that Jump could therefore obtain preliminary injunctive relief in court to protect its rights prior to any final resolution of a dispute in arbitration.

9.  Accordingly, and in order to protect its Confidential and/or Proprietary Information and prevent the irreparable harm that will occur if Heeger can continue to compete with Jump, Jump seeks preliminary injunctive relief to enforce his non-competition and confidentiality promises and to halt Heeger's wrongdoing pending final resolution of the dispute in arbitration.

## THE PARTIES, JURISDICTION, AND VENUE

10.  Plaintiff Jump Operations, LLC is a limited liability company organized under Delaware law. Jump Operations, LLC's sole member is Jump Financial, LLC. Jump Financial, LLC is also a limited liability company organized under Delaware law. The members of Jump Financial, LLC are the William DiSomma Trust, the trustee of which is William DiSomma, a citizen of Illinois, the Paul A. Gurinas Trust, the trustee of which is Paul Gurinas, a citizen of Illinois, ███████████████████████████████, and the following individuals: ██████████████████████, ██████████████, Brandon Ackley (Illinois citizen), ████████████████████; ████████████

█████████, and ████████████████████████. Thus, for purposes of diversity, Jump Operations, LLC is a citizen of Illinois and New York.

11.     Defendant Liam Heeger is a citizen of California.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See McCarty v. Amoco Pipeline Co.*, 595 F.2d 389, 393, 395 (7th Cir. 1979) (holding that the amount in controversy for a suit seeking injunctive relief is determined by "the pecuniary result to either party which the judgment would directly produce").

13.     This Court has personal jurisdiction over Heeger under 735 ILCS 5/2-209 in that during the entire period of his employment, he resided in Chicago, Cook County, Illinois, transacted business in Chicago, Cook County, Illinois, made and performed contracts substantially connected with the State of Illinois, and worked in Chicago, Cook County, Illinois, throughout his employment with Jump, and otherwise has sufficient minimum contacts with Illinois to warrant the Court's exercise of jurisdiction over him. Furthermore, under his Employment Agreements, Heeger also consented to this Court's jurisdiction:

> I HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENT TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES OF AMERICA . . . I WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION, SUIT, ARBITRATION OR PROCEEDING IN ANY SUCH COURTS AND WAIVE AND AGREE NOT TO PLEAD OR CLAIM THAT ANY SUCH ACTION, SUIT, ARBITRATION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR FORUM HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.[2]

---

[2] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 10(e) (capitalization in original); *see also* Ex. B, Non-Competition Agreement § 10(b) (incorporating Section 10(e) of Confidential and/or Proprietary Information Agreement); Ex. C, Non-Solicitation Agreement § 6(b) (same).

4

14.     This Court has jurisdiction to grant a preliminary injunction under Heeger's employment agreements, which allow Jump to "obtain emergency, temporary and/or preliminary relief and enforcement of [Heeger's restrictive covenants] in any court . . . of competent jurisdiction."[3] Moreover, although Heeger's employment agreements contain an arbitration provision, that provision expressly states that Jump may bring claims for "emergency, temporary and/or preliminary relief and enforcement of" the agreements in this Court.[4]

15.     Venue is proper in this District under 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim occurred in this District and in that Heeger agreed to the venue here for any action arising out of his Employment Agreements.[5]

## FACTUAL BACKGROUND

### A.     Jump and Project Firedancer

16.     JTG, is a leading proprietary quantitative and research-based trading and technology firm with decades of experience focusing on developing cutting-edge statistical research techniques and tools, and pairing that research with applications and infrastructure to provide traders and researchers with a competitive advantage in the financial industry. Jump Trading Group trades and invests in a variety of asset classes worldwide, including markets for cryptocurrencies and other digital assets and coins in addition to more traditional asset classes. JTG employs approximately 1,600 people worldwide.

---

[3] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 10(b) (emphasis added); *see also* Ex. B, Non-Competition Agreement § 10(b) (incorporating Section 10(b) of Confidential and/or Proprietary Information Agreement); Ex. C, Non-Solicitation Agreement § 6(b) (same).

[4] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 10(c) (emphasis added); *see also* Ex. B, Non-Competition Agreement § 10(b) (incorporating Section 10(c) of Confidential and/or Proprietary Information Agreement); Ex. C, Non-Solicitation Agreement § 6(b) (same).

[5] *See id.*

17.     Cryptocurrencies are non-fiat digital assets that can be used for transactions over computer networks. Cryptocurrencies use cryptographic techniques to secure transactions and verify the transfer of funds.

18.     Cryptocurrencies are supported by blockchain technology. A blockchain is a digital, decentralized, public ledger that maintains cryptographically-secured records of digital asset ownership and transactions. Blockchains rely on "validators," which are computers distributed across the world that are responsible for verifying and processing new transactions, adding them to the blockchain, and reaching (or not reaching) consensus with other validators regarding the validity of blocks. Validators perform those duties by using software referred to as a "validator client."

19.     As a part of its business, JTG is involved in investing in, developing, building, and supporting blockchain technology, including critical infrastructure needed to catalyze the growth of blockchain ecosystems.

20.     The blockchain development business is by its nature worldwide, as blockchains are digital ecosystems used to buy and sell digital assets and are not constrained by country borders. Thus, blockchain development firms and their counterparties do not need to be in any particular location; rather, they can operate anywhere there is a computer connected to a global network.

21.     The Solana Foundation is a non-profit organization dedicated to the decentralization, advancement, and security of the Solana network, a high performance layer-1 blockchain.

22.     In 2022, the Solana Foundation contracted with JTG to leverage JTG's decades of expertise with high-capacity, low-latency technologies to build a new validator client with a new

codebase (written in a different programming language from other Solana validator clients) for the Solana blockchain platform to increase the platform's networking throughput, resilience, and efficiency. This project was named "Project Firedancer" after the name of the new validator client JTG was retained to develop. This more efficient blockchain software is designed to, among other things, enable Solana to process a significantly larger number of transactions per second.[6] The Firedancer software development project is ongoing. In simple terms, it may be useful to consider this project like developing the next major generation of software for an iPhone or a Google-based mobile phone – a software upgrade that will substantially improve the user experience, including making the phone far more efficient, speedy, and secure.

23.     Project Firedancer has thus far been successful, and as a result, lucrative for JTG, bringing in cryptocurrency tokens worth millions of dollars for JTG. This success is a direct result of JTG's intellectual labor and significant investments.

**B.     Heeger's Role at Jump**

24.     On or around January 31, 2023, Jump hired Heeger as a Software Engineer based in Jump's office in Chicago, Illinois. Heeger commenced work at Jump on February 21, 2023.

---

[6] *See, e.g.,* David Liang, *Firedancer: A New Era for Solana's Network Performance*, Figment (December 18, 2024), https://figment.io/insights/firedancer-a-new-era-for-solanas-network-performance/ (Firedancer is a validator client developed by Jump Crypto that represents a complete rewrite of Solana's validator software in the C++ programming language. Firedancer's importance is twofold: first, it provides technical improvements that decrease Solana's network vulnerability and increase transaction capabilities, and second, it standardizes Solana's protocols, which makes it easier for new developers to understand and contribute to the Solana ecosystem.); *see also* Kraken Learn Team, *What Is Firedancer, and Why Is It Big for Solana?*, Kraken (November 26, 2024), https://www.kraken.com/learn/what-is-firedancer-solana (Firedancer's improvements to the Solana blockchain, including increased client diversity, improved transaction processing capabilities, and proving support for sharding, increase Solana's appeal as a Layer-1 blockchain in a competitive market.).

25.     Heeger worked as one of the lead software engineers on Project Firedancer. Under the leadership and direction of highly sophisticated scientists and engineers, including at least two Ph.D's, Heeger was tasked with reviewing, analyzing, designing, writing, and optimizing blockchain code for the validator client, based on Jump's proprietary blockchain development methods, and Heeger both developed and had considerable access to highly sensitive Confidential and/or Proprietary Information, including knowledge and information on business plans and strategies, blockchain models, unreleased codebases, and software tools.

26.     Open, extensive collaboration and information sharing among members of the team was encouraged and expected regardless of their individual tasks within the project. That ethos was typified by, for example, a weekly meeting among Jump's engineers on the project across the globe, which could last multiple hours and in which team members would brainstorm ideas, participate in the decision-making process, and understand why particular approaches were taken (and, perhaps equally importantly, why other approaches were rejected). Moreover, reflective of his leadership on Project Firedancer, Heeger also was one of only a few team members to meet with representatives from the Solana Foundation and other Solana entities on behalf of Jump and, as discussed below, to speak at a widely attended conference organized by the Solana Foundation to present the project's accomplishments. The information and documents Heeger had access to and contributed to while at Jump would give Heeger an unquestionable head start in launching a competitive business.

27.     Additionally, Heeger's status as Software Engineer afforded Heeger the opportunity to receive considerable compensation from Jump, including (1) an annual base salary of $200,000; (2) a one-time sign-on bonus of $25,000; (3) a one-time payment of $10,000 in consideration for entering into the Non-Solicitation Agreement; and (4) annual discretionary

bonuses, with a guaranteed minimum bonus of $200,000 prorated for the remaining 2023 calendar year. Between 2023 and 2024 alone, Heeger received total compensation of more than $600,000 from Jump.

**C.      Jump's Confidential and/or Proprietary Information**

28.      Jump's ability to run its business profitably in the blockchain space depends on its ability to keep its intellectual property—including strategies, proprietary data, research, and technology—confidential.[7] Preserving secrecy ensures that Jump can fully capitalize on its intellectual property, development strengths, and the agreements it has made in the blockchain space and derive maximum value from its innovations. If a competitor were to learn of or be exposed to Jump's Confidential and/or Proprietary Information (and particularly before it is able to extract the value from that information), for example, the value of that information would be diminished and could even be lost entirely.

29.      Additionally, JTG's significant investment in its intellectual property allows it to attract business opportunities like with the Solana Foundation and Project Firedancer. When explaining why Solana decided to partner with JTG, Dan Albert, executive director of the Solana Foundation, stated: "Jump has unparalleled experience with over 20 years of scaling networks and building highly performant software systems."[8]

30.      Protecting Jump's Confidential and/or Proprietary Information is therefore critical to maintaining JTG's competitive position in the blockchain development industry. Were its

---

[7] Even where software is eventually released as open-source software, the strategies, considerations, and tools that went into its development remain confidential except if a strategy decision is made to release them.

[8] *See* Tracy Wang, *Jump Crypto Picked to Revamp Solana to Make Blockchain More Reliable*, CoinDesk          (May          11,          2023          at          5:38          p.m.          UTC), https://www.coindesk.com/business/2022/08/16/jump-crypto-picked-to-revamp-solana-to-make-blockchain-more-reliable.

9

information to be improperly disclosed, it could allow a competitor to exploit the resources that JTG has invested in its intellectual property, shortcut the research and development process, and gain an unfair advantage in securing potential business partnerships. Specifically, as part of Project Firedancer, JTG has completely rewritten the Solana client validator to build—from the ground up—a new, fully independent validator client that is faster and more reliable than the previous version.[9] Allowing Heeger to use Jump's Confidential and/or Proprietary Information for his new venture would give him an improper head start and significantly undercut the value of Jump's years of work and its human capital, which Jump has spent millions of dollars to build, with respect to future projects.

31.     Due to the significant value of Jump's Confidential and/or Proprietary Information, Jump devotes substantial resources to sophisticated security mechanisms to protect that information and ensure its intellectual property is not disclosed. Jump emphasizes the importance of protecting its Confidential and/or Proprietary Information to employees in onboarding sessions on day 1 and in periodic trainings, and it spends a significant amount of money on security hardware, software, and other services. For example, Jump has protocols in place to prevent its Confidential and/or Proprietary Information from being downloaded or copied in an unauthorized manner; it requires two-factor authentication for remote access; and, when an employee resigns or is terminated, the company—within a matter of minutes—removes the employee's access to all Jump's systems, shuts down his or her computer, and disables his or her IT access.

---

[9] *See, e.g.,* Joe Hoffend, *What Is Firedancer and Its Importance to Solana?*, Medium (November 7, 2023), https://medium.com/@joehoffend/what-is-firedancer-and-its-importance-to-solana-f56a38bbbfa2 (Firedancer "marks a significant stride towards improving Solana's performance, scalability, and decentralization by introducing client diversity, which is pivotal for the network's resilience.").

32.     In spite of these security measures and because it is nearly impossible to know whether a former employee is improperly using or disclosing confidential information, Jump also relies on restrictive covenants, such as the Non-Competition Agreement, to protect the value of its Confidential and/or Proprietary Information.

**C.     Heeger's Restrictive Covenants**

33.     Jump, like others in its industry, enters into agreements with its employees not only to directly bar the release of confidential information, but also to restrict competitive activity for a period of time after an employee leaves Jump in order to ensure the security and integrity of its intellectual property. In return, Jump provides access to its proprietary information and infrastructure to those employees during their employment and monetary payments for the duration of the former employee's noncompetition period.

34.     As part of his employment at Jump, Heeger signed the Offer Letter on January 31, 2023, effective February 21, 2023.[10] Under the Offer Letter, Heeger agreed "to devote [his] full business time, attention, and best efforts to the performance of [his] duties and to the furtherance of Jump's interests" and "to comply in all material respects with all applicable policies and procedures contained in the [Jump's] Employee Handbooks and compliance policies."[11]

---

[10] A true and correct copy of Heeger's Offer Letter is attached hereto as **Exhibit A**.

[11] *See* Ex. A, Offer Letter at 1. A true and correct copy of Jump's Information Technology Acceptable Use Policy is attached hereto as **Exhibit E**.

35.     On January 31, 2023, Heeger also signed the Non-Competition Agreement, the Non-Solicitation Agreement, and the Confidential and/or Proprietary Information Agreement.[12] In the Employment Agreements, Heeger agreed to certain restrictive covenants.

36.     Heeger's restrictive covenants include, among others, prohibitions against competing with Jump (throughout Heeger's employment and until November 11, 2026), soliciting Jump's employees, consultants, trading counterparties, or suppliers (throughout Heeger's employment and until November 11, 2026), and disclosing Jump's Confidential and/or Proprietary Information (throughout Heeger's employment and thereafter). In addition to agreeing to abide by those restrictive covenants, Heeger also agreed to assign to Jump intellectual property rights for certain work he created during his employment at Jump.

*Heeger's Non-Competition Obligations*

37.     Under the Non-Competition Agreement, Heeger "recognize[d] and acknowledge[d]" that JTG is "engaged in . . . the development of, design of, research regarding, building, implementing, overseeing, managing, supporting, monitoring, using, acquiring, investing in, commercializing, and/or providing, among other things: blockchain validation/mining; blockchain infrastructure-as-a-service; blockchain networks, protocols, chains, platforms, and tokens (collectively, 'Blockchain Projects'); and systems and platforms for use in connection with Blockchain Projects."[13]

38.     Heeger further acknowledged that (i) "[s]olely by virtue of [his] employment with [Jump, he] ha[s] acquired and/or will acquire confidential and/or proprietary information

---

[12] A true and correct copy of Heeger's Non-Competition Agreement is attached hereto as **Exhibit B**. A true and correct copy of Heeger's Non-Solicitation Agreement is attached hereto as **Exhibit C**. A true and correct copy of Heeger's Confidential and/or Proprietary Information Agreement is attached hereto as **Exhibit D**.

[13] *See* Ex. B, Non-Competition Agreement § 1(a)(ii)(3).

belonging to [JTG], and but for this association with [Jump, he] would not have had access or continue to have access to such confidential and/or proprietary information" and (ii) "[t]he nature of [his] employment with [Jump] exposes or will expose [him] to confidential and/or proprietary information that is key to [JTG's] competitive advantage and business and which would cause irreparable harm to [JTG] if improperly used or disclosed."[14]

39.     Accordingly, with respect to Jump's Blockchain Projects and other business, Heeger "agree[d] to not engage directly or indirectly in Competitive Activity, including assisting another to engage in Competitive Activity, at all times during [his] employment with [Jump]" and for up to an additional two years after his separation from the company.[15] Heeger and Jump agreed that the precise duration of the post-employment non-compete period (up to two years) would be elected by Jump within ten business days following his separation date.[16] He further agreed that if he breached his non-compete obligation, "the Noncompete Period shall be extended by a period of time equal to that period beginning when such breach commences and ending when the activities constituting such breach terminate."[17]

40.     The Non-Competition Agreement defines the term "Competitive Activity," in relevant part, as "engaging in or doing any of the following":

> i.   Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that is engaged in any aspect of the Business of [JTG] where my role is, or is expected to be, a Similar Role;
> 
> *****
> 
> iii.  Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that designs, develops, builds, or invests in goods, services, or resources particularly

---

[14] *See id.* § 1(c).

[15] *See id.* § 2(a), (e).

[16] *See id.* § 2(e).

[17] *See id.* § 8.

suited for or designed for use in connection with Trading where my role is, or is expected to be, a Similar Role;

*****

v. Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that is engaged in any aspect of the Business of [JTG] in a role where confidential information [Heeger] had access to would be useful in the performance of my job responsibilities;

*****

vii. Engaging in any activity that constitutes part of the Business of [JTG] to the extent such activity is Related Activity;

viii. Preparing to engage in any activity that constitutes the Business of [JTG] to the extent such activity is Related Activity; [and]

ix. Developing or overseeing the development of software or hardware platforms with direct or indirect application to Trading to the extent such activity is Related Activity.[18]

41.     The Non-Competition Agreement defines "Related Activity" as "activity similar to work [Heeger] did, services [Heeger] provided, expertise [Heeger] used for [Jump or JTG], or activity to which confidential information to which [Heeger] was exposed at [Jump] pertains."[19] It also defines "Similar Role" as a "role similar to [Heeger's] role at [Jump] in terms of the services [he] provide[d], the responsibilities [he] under[took], or the expertise [he] use[d]."[20]

42.     The Non-Competition Agreement further provides that Jump would pay Heeger his base salary for the duration of his non-compete obligations, provided he abides by his agreement not to compete.[21] Consistent with this obligation, and despite his breach, Jump has been providing Heeger these amounts since he resigned from Jump. To date, Heeger has not returned any of these payments.

---

[18] *See id.* § 2(c).

[19] *See id.* § 2(f).

[20] *See id.* § 2(g).

[21] *See id.* § 4(b).

*Heeger's Non-Disclosure Obligations*

43.     In the Confidential and/or Proprietary Information Agreement, Heeger expressly acknowledged that "the services [he] will render to [Jump] are of a special, unique, extraordinary and intellectual character and [his] position with [Jump] places [him] in a position of confidence and trust."[22]

44.     Heeger acknowledged in the Confidential and/or Proprietary Information Agreement that, by nature of his employment, he "necessarily" would obtain JTG's Confidential and/or Proprietary Information.[23] He further acknowledged that he understood the value of such information and its confidentiality and that its disclosure could harm JTG:

> I understand that [JTG's] industry is highly competitive and that the competitors in this industry derive significant value from Confidential and/or Proprietary Information. [JTG has] devoted considerable resources in developing their Confidential and/or Proprietary Information, and such Confidential and/or Proprietary Information, as well as all other information relating to JTG's activities that is not generally known outside of [JTG], is key to [JTG's] competitive advantage and business. Any loss or erosion of [JTG's] competitive advantage through the disclosure or improper use of its Confidential and/or Proprietary Information could have severe repercussions on [JTG's] business.[24]

45.     Under the Confidential and/or Proprietary Information Agreement, Heeger agreed to abide by the following non-disclosure (including non-use) obligations, which do not expire:

> I agree . . . at all times during the term of my Relationship with [Jump] and thereafter, regardless of the reason or lack of reason for termination of the Relationship: (i) to hold Confidential and/or Proprietary Information in strictest confidence; (ii) except for the benefit of [JTG] during the Relationship, not to use or to disclose to any person, firm, corporation or other entity any Confidential and/or Proprietary Information without the written authorization of [Jump];

---

[22] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 2(a).

[23] *See id.*

[24] *See id.*

(iii) except for the benefit of [JTG] during the Relationship, not to make copies of Confidential and/or Proprietary Information or remove such information from [JTG's] premises, either physically or electronically, without express, written permission from [Jump]; and (iv) notwithstanding any other provision in this subsection, not to remove or send (either physically or electronically) any computer code from [JTG's] premises or out of [JTG's] computer systems (for example and without limitation, by emailing it out of the [Jump] or uploading it to non-[Jump] cloud storage) regardless of the reason for doing so. I agree to immediately notify [Jump] of any unauthorized disclosure or use of any Confidential and/or Proprietary Information of which I become aware. I agree not to reference on social media or on any publicly available website the internal name of any trading team or department (i.e., a team or department name that the [Jump] does not publicly advertise) without the [Jump's] permission. [25]

46. The Confidential and/or Proprietary Information Agreement also provides the following definition of "Confidential and/or Proprietary Information":

"Confidential and/or Proprietary Information" means all information that is not publicly known pertaining to any aspect of [JTG's] business. This includes [JTG's] current business and plans, prior business and plans, and future and/or contemplated business and plans, whether in tangible or intangible form. By way of example only, and without limitation, the covered information includes technical data; trading methods; trading positions; procedures; investment techniques; strategies; trade secrets and know how; research; product plans; equipment plans and designs; business plans; products; services; suppliers; counterparties; investors; prices; costs; markets; software; code; algorithms; developments; inventions; laboratory notebooks; processes; formulas; technology; designs; drawings; engineering; hardware configuration information; marketing; licenses; finances; budgets; the identities, roles, and compensation of employees; the identities of trading team and department members; the profitability and other performance characteristics of trading teams, [Jump] and [JTG] overall, and any subdivision thereof; and other business information. Confidential and/or Proprietary Information includes information created by [Heeger] during the Relationship, whether or not during working hours. [26]

---

[25] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 2(a).

[26] *See id.* § 2.

*Heeger's Obligation To Return Information*

47.     Under the Confidential and/or Proprietary Information Agreement, Heeger agreed

to abide by the following return-of-information obligation, which does not expire:

> I agree not to remove any property of [JTG], including, but not
> limited to, any Confidential and/or Proprietary Information, from
> any [JTG] premises at any time, without the prior written approval
> of [Jump] . . . . Unless specifically authorized by [Jump] in writing,
> I understand that I may not place any [JTG] property on Removable
> Media, as defined below. I agree that, at the time of termination of
> my Relationship with [Jump] or and at any time on demand by
> [Jump], I will deliver to [Jump] (and will not keep in my possession,
> recreate or deliver to anyone else) any and all [JTG] property,
> including, but not limited to, any Confidential and/or Proprietary
> Information, devices, records, data, notes, reports, proposals, lists,
> correspondence, specifications, drawings, blueprints, sketches,
> laboratory notebooks, materials, flow charts, equipment, other
> documents (whether or not they are confidential) or property, or
> reproductions or summaries of any aforementioned items developed
> by me pursuant to the Relationship or otherwise belonging to [JTG],
> its successors or assigns or provided to [JTG] by third parties. I
> further agree that any property situated on any [JTG] premises or
> owned by [JTG] (including computers, mobile devices, disks and
> other storage media, filing cabinets, or other physical or electronic
> storage and work areas), is subject to inspection by [Jump]
> personnel at any time with or without notice.[27]

*Jump's Information Technology Acceptable Use Policy*

48.     Heeger agreed in the Offer Letter "to comply in all material respects with all

applicable policies and procedures contained in [Jump's] Employee Handbooks and compliance

policies."[28] This included the following Information Technology Acceptable Use Policy set forth

in Jump's U.S. Employee Handbook:

> Access to and use of [JTG's] information technology ("IT") systems
> is provided for the sole purpose of performing work for the benefit
> of [JTG]. Any use of [JTG's] IT systems in a manner or for a
> purpose that is contrary to the best interests of [JTG] is strictly

---

[27] *See id.* § 4.

[28] *See* Ex. A, Offer Letter at 1.

forbidden. Forbidden uses include, without limitation, using [JTG's] IT systems for the benefit of a competitor or of a recruiting firm, to solicit or help others solicit [JTG] employees, to prepare to compete with [JTG], or to engage in any malicious or unlawful act . . . .

Never share anything obtained from a [JTG] system with a third party except when necessary to perform your job. Sharing data with third parties when required should be via approved systems, and extreme care should be taken when handling personal data or sensitive [JTG] IP. If you are in doubt, consult with the Legal Department regarding proper handling procedures . . . .

You are **not** permitted to keep any copies of [JTG] property on any home or personal device, system, or account (or any device not managed by [JTG]) without the written approval of the Information Security Department, the Compliance Department, or the Legal Department.[29]

*Heeger's Acknowledgement That His Restrictive Covenants Are Reasonable*

49.     Under the Non-Competition Agreement, Heeger acknowledged (a) "that the provisions of [the Non-Competition Agreement] will limit [his] ability to earn a livelihood in an identical or similar business for the duration of the Noncompete Period"; (b) "the global nature of [JTG's] business and the efforts [JTG] undertake[s] to develop, preserve, and protect its business and competitive advantage"; and (c) "[i]n light of the need to protect [JTG's] competitive position and confidential and proprietary information, [Heeger] agree[d] that the scope and duration of the restrictions and limitations contained in [the Non-Competition Agreement] are reasonable to protect the legitimate business interests of [JTG]."[30]

50.     Under the Non-Competition Agreement, Non-Solicitation Agreement, and Confidential and/or Proprietary Information Agreement, Heeger also acknowledged that (a) "a breach of any terms contained in [the Employment Agreements] would cause immediate and

---

[29] *See* Ex. E, Jump's Information Technology Acceptable Use Policy, at 1–3 (emphasis in original).

[30] *See* Ex. B, Non-Competition Agreement § 7.

irreparable injury to [Jump] for which there may be no adequate remedy at law" and (b) if Heeger

"breached or threaten[ed] to breach any provision of [the Employment Agreements], [Jump] shall

be entitled to obtain emergency, temporary and/or preliminary relief and enforcement of [the

Employment Agreements] in any court or arbitration forum of competent jurisdiction by means of

a decree of specific performance, an injunction, and/or any other form of equitable relief without

the necessity of posting a bond in connection with any relief sought or granted."[31]

*Heeger's Assignment of Intellectual Property*

51.     In addition to agreeing to abide by those restrictive covenants, Heeger also agreed

in the Confidential and/or Proprietary Information Agreement to assign to Jump intellectual

property rights for any work he created during his employment at Jump:

> I agree that I will promptly make full written disclosure to [Jump],
> will hold in trust for the sole right and benefit of [Jump], and hereby
> assign to [Jump], or its designee, all my right, title and interest
> throughout the world in and to any and all Creative Works that I may
> solely or jointly conceive or develop or reduce to practice, or cause
> to be conceived or developed or reduced to practice, during the
> Relationship, except as provided in this subsection. I agree not to, at
> any time, assert any claim, ownership, or other interest in any of
> such Creative Works. . . . Pursuant to the Employee Patent Act,
> Illinois Public Act 83-493, [Jump] has hereby informed me that the
> provisions of this subsection will not apply to any inventions for
> which no equipment, supplies, facilities or trade secret information
> of [JTG] were used and which were developed entirely on my own
> time, unless (1) the invention relates (i) to the business of [JTG], or
> (ii) to actual or demonstrably anticipated research or development

---

[31] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 10(b); *see also* Ex. B, Non-Competition Agreement § 10(b) (incorporating Section 10(b) of Confidential and/or Proprietary Information Agreement); Ex. C, Non-Solicitation Agreement § 6(b) (same).

of [JTG], or (2) the invention results from any work performed by me for [JTG].[32]

52.     The Confidential and/or Proprietary Information Agreement defines "Creative Works" to include, among other things, "all original works of authorship, inventions, discoveries, designs, computer hardware and software, algorithms, programming, scripts, applets, databases, database structures, or other confidential and/or proprietary information, business ideas, and related improvements and devices, which were or are conceived, developed, or made by [ Heeger], either alone or with others."[33]

*Heeger's Fee-Shifting Obligations*

53.     Under the Non-Competition Agreement, Non-Solicitation Agreement, and Confidential and/or Proprietary Information Agreement, Heeger agreed that "[i]n addition to any and all other remedies available at law or in equity in any lawsuit or arbitration hereunder, the Prevailing Party in any lawsuit or arbitration related to this Agreement will be entitled to recover all reasonable costs and expenses, including reasonable legal fees, incurred in connection with such dispute, in addition to all other remedies available at law or in equity."[34]

*The Employment Agreements' Choice Of Law Provisions*

54.     The Non-Competition Agreement, Non-Solicitation Agreement, and Confidential and/or Proprietary Information Agreement contain an Illinois choice-of-law provision.[35]

---

[32] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 3(c).

[33] *See id.* § 3(a).

[34] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 10(d); *see also* Ex. B, Non-Competition Agreement § 10(b) (incorporating Section 10(d) of Confidential and/or Proprietary Information Agreement); Ex. C, Non-Solicitation Agreement § 6(b) (same).

[35] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 10(a); *see also* Ex. B, Non-Competition Agreement § 10(b) (incorporating Section 10(a) of Confidential and/or Proprietary Information Agreement); Ex. C, Non-Solicitation Agreement § 6(b) (same).

**D. Heeger Launches A Competitor to Jump While He Is *Still* Employed By Jump And Misappropriates Jump's Confidential and/or Proprietary Information**

55.     On September 20–21, 2024, the Solana Foundation hosted a cryptocurrency conference, "Breakpoint," in Singapore where, among other things, Jump was invited to announce its recent accomplishments with respect to Project Firedancer. As a part of this conference, the Solana Foundation hosted thousands of attendees to participate in keynote talks, workshops, panel discussions, and fireside chats from some of the brightest minds in and out of the Solana ecosystem.

56.     Because of his lead role on Project Firedancer, Heeger was one of only two Jump Software Engineers to lead Jump's final presentation at the Breakpoint conference, delivered on September 21, 2024, where Heeger described Jump's work on Project Firedancer and discussed Jump's recent accomplishments on the project.

57.     On-stage, Heeger described Jump's accomplishments with respect to Project Firedancer and announced that Jump's validator client had gone live on Solana's test network.[36] Off-stage, on information and belief, Heeger met with venture capital firms to raise funds for the launch of a new business venture that would directly compete with Jump and the very same project that he was presenting onstage, Project Firedancer.

58.     Back in Chicago during the weeks that followed the Breakpoint conference, Heeger's colleagues at Jump noticed that Heeger was acting abnormally. He spent more time texting on his personal cell phone than normal, even during team videoconferences, and on his last

---

[36] A video of Heeger's September 21, 2024 presentation about Project Firedancer at Solana's Breakpoint conference can be found online on Jump's website, available at https://jumpcrypto.com/firedancer/. A direct link to this video is also available at https://youtu.be/InGI7BDUeX4.

day (Friday, November 8) he uncharacteristically said that he needed to take a private call in a conference room. He also seemed stressed and distracted from his work.

59.     On information and belief, Heeger's suspicious behavior was the direct result of him actively working—during his employment by Jump, in Jump's offices, during regular working hours, and using Jump's equipment and facilities—to launch a competitor to Jump in direct violation of his contractual obligations.

60.     On information and belief, Heeger, while employed at Jump, may have also violated Jump's Information Technology Acceptable Use Policy by improperly using his personal account on GitHub, a web-based platform that allows developers to store, share, and collaborate on computer code. Heeger's personal GitHub account has the handle "CantelopePeel," and that account reflects coding activity while Heeger was employed by Jump. To the extent that this work relates to the creation of blockchain technologies, then Heeger's conduct constitutes a violation of Jump's Information Technology Acceptable Use Policy. Furthermore, under the plain language of the Confidential and/or Proprietary Information Agreement, any such work that Heeger created using his personal GitHub account belongs to Jump, not Heeger, and Heeger's use or disclosure of that work constitutes a violation of that agreement.[37]

**E.     Heeger Continues To Violate His Restrictive Covenants After Resigning From Jump**

61.     At 8:00 am on Monday, November 11, 2024, Heeger emailed his supervisor at Jump and said that he was resigning, effective immediately, because he was "just not enjoying [his] work at Jump any more, among many other factors." When his supervisor reached out to discuss, Heeger wrote that "[t]his project has really worn me out. It is not anyone's fault nor is it personal. Nothing has happened suddenly nor has it been anything you have done." Heeger's

---

[37] *See* Ex. D, Confidential and/or Proprietary Information Agreement § 3(c).

22

cryptic explanation for his resignation concerned Jump enough that it conducted a wellness check on Heeger. Heeger's decision to conceal his competing venture and instead lie about his reason for resigning from Jump demonstrates his awareness that he had been acting improperly and that he intended to act improperly with respect to the obligations in his restrictive covenants.

62.     On November 21, 2024, a member of Jump's human resources department emailed Heeger a letter to remind him about the restrictive covenants contained in his Employment Agreements, and, in accordance with those agreements, to formally elect a noncompete period of two years.[38]

63.     Roughly one month after his resignation, on December 10, 2024, Heeger reached out to one of his former colleagues at Jump and told him that he had been secretly working to launch a business venture that aimed to develop a new blockchain platform. According to Heeger, his new venture had secured $3 million in capital at a $50 million valuation, of which he was selling 6% and retaining the remaining 94% for himself.

64.      Heeger's new venture, which would directly compete with Jump's work on Project Firedancer and the Solana blockchain and would constitute a Competitive Activity under the Non-Competition Agreement, violates the plain terms of that agreement.

65.     During Heeger's conversation with his former colleague on December 10, 2024, Heeger said that his investors include Framework Ventures and its sister company, Framework Labs.[39] Heeger also told his colleague that he is a limited partner in Framework Ventures.

---

[38] A true and correct copy of Jump's November 21, 2024 letter to Heeger is attached hereto as **Exhibit F.**

[39] *See* Rory Murray, *Public Blockchain Investors Behind Chainlink And Synthetix Raise $8 Million For Startup Crypto Technology Laboratory* (August 27, 2020) ("Framework Labs is a spinout from Framework Ventures, an investment firm run by entrepreneurs, partners, and investors Michael Anderson and Vance Spencer.").

66.     Framework Ventures is a crypto-native venture capital firm that focuses on investing in early-stage opportunities in, among other things, blockchain infrastructure projects. On information and belief, Heeger's investors, including but not limited to Framework Ventures and Framework Labs, were aware Heeger had been working on his new venture while he was still employed by Jump and therefore was in breach of his contractual obligations to Jump, for his own benefit and for their benefit. Accordingly, those funding Heeger's business, such as Framework Ventures and Framework Labs, knew or should have known that they were aiding and encouraging Heeger's breach of his obligations to Jump and tortiously interfering with his Employment Agreements.

67.     During Heeger's conversation with his former colleague on December 10, 2024, Heeger also asked if Jump would agree to license certain of Jump's intellectual property to his new venture. This is further evidence that Heeger is seeking to engage in activity that violates his noncompetition obligations.

68.     The following day, on December 11, 2024, Heeger emailed his former supervisor and said, "[i]f you have some time, we should chat this week." In response, Heeger's former supervisor agreed to speak with Heeger two days later. During this conversation, Heeger's former supervisor reminded Heeger that he signed a Non-Competition Agreement and asked Heeger whether he intended to comply with it. Heeger responded that he had intended to comply with his Non-Competition Agreement when he signed it, but that he had since traveled to California and that California has a different law than Illinois that says that ***he was no longer required to comply with his non-compete obligations.*** There could be no clearer indication that Heeger has already violated and intends to continue violating those obligations.

69.     Plainly, the timing of Heeger's announcement that his business had already launched and been venture capital-funded, his detachment from work and odd behavior during his final weeks at Jump, his proffered false pretense for resigning from Jump, and his apparent secret meetings with venture capital firms during Solana's September 2024 Breakpoint conference all demonstrate beyond peradventure that Heeger performed work for his competing venture long before he resigned from Jump on November 11, 2024. Heeger kept his competing work a secret from Jump and even lied about his reason for resigning, with the apparent hope that he could somehow evade his contractual obligations by waiting a few weeks and then announcing his competing venture, under the guise of no longer being a Jump employee. On information and belief, however, Heeger was in the market competing against Jump while he was still an employee of Jump, continued to do so after his resignation, and has shown every intention of continuing to do so, all in direct violation of his contractual restrictive covenants.

## FIRST CAUSE OF ACTION
### Breach of Heeger's Duty of Loyalty Under the Offer Letter

70.     Jump repeats and realleges paragraphs 1–69 of the Complaint as if fully set forth herein.

71.     The Offer Letter constitutes a valid, enforceable contract between Heeger and Jump. In addition, the restrictive covenants contained in the Offer Letter are supported by a legitimate business interest, are reasonable as to scope, do not impose any undue hardship on Heeger and are not injurious to the public.

72. Heeger has breached his obligation under the Offer Letter "to devote [his] full business time, attention, and best efforts to the performance of [his] duties and to the furtherance of Jump's interests".[40]

73. Jump has fully performed pursuant to the Offer Letter.

74. Jump has suffered or will suffer irreparable injury by the breach of the Offer Letter in the form, among others, of actual and potential misuse of and/or release of highly confidential and proprietary information by and to a competitor.

**SECOND CAUSE OF ACTION**
**Breach of Heeger's Non-Competition Obligation Under the Non-Competition Agreement**

75. Jump repeats and realleges paragraphs 1–74 of the Complaint as if fully set forth herein.

76. The Non-Competition Agreement constitutes a valid, enforceable contract between Heeger and Jump. In addition, the restrictive covenants contained in the Non-Competition Agreement are supported by a legitimate business interest, are reasonable as to scope, do not impose any undue hardship on Heeger, and are not injurious to the public.

77. Under the Non-Competition Agreement, Heeger agreed, among other things, "to not engage directly or indirectly in Competitive Activity, including assisting another to engage in Competitive Activity, at all times during [his] employment with [Jump]" and for up to an additional two years after his separation from the company.[41]

78. Heeger has breached and is threatening to further breach his non-competition obligations under the Non-Competition Agreement.

---

[40] *See* Ex. A, Offer Letter, at 1.

[41] *See* Ex. B, Non-Competition Agreement § 2.

79.     Jump has fully performed pursuant to the Non-Competition Agreement, including by paying Heeger additional post-employment payments equal to his annual salary of $200,000 (or roughly $16,667 per month) for the duration of his post-termination non-competition obligations.

80.     Jump has suffered or will suffer irreparable injury by the breach of the Non-Competition Agreement in the form, among others, of actual and potential misuse of and/or release of highly confidential and proprietary information by and to a competitor.

### THIRD CAUSE OF ACTION
### Breach of the Confidential and/or Proprietary Information Agreement

81.     Jump repeats and realleges paragraphs 1–80 of the Complaint as if fully set forth herein.

82.     The Confidential and/or Proprietary Information Agreement constitutes a valid, enforceable contract between Heeger and Jump. In addition, the restrictive covenants contained in the Confidential and/or Proprietary Information Agreement are supported by a legitimate business interest, are reasonable as to scope, do not impose any undue hardship on Heeger, and are not injurious to the public.

83.     Under the Confidential and/or Proprietary Information Agreement, Heeger "agree[d] . . . at all times during [his employment] with [Jump] and thereafter, regardless of the reason or lack of reason . . . to hold Confidential and/or Proprietary Information in strictest confidence" and "except for the benefit of [JTG] . . . not to use or to disclose to any person, firm, corporation or other entity any Confidential and/or Proprietary Information without the written authorization of [Jump]."[42]

---

[42]  *See* Ex. D, Confidential and/or Proprietary Information Agreement § 2.

84.     Under the Confidential and/or Proprietary Information Agreement, Heeger also agreed to assign to Jump intellectual property rights for certain work he created during his employment at Jump.[43]

85.      Heeger has breached and is threatening to further breach his non-disclosure and non-use obligations under the Confidential and/or Proprietary Information Agreement as well as his agreement under the Confidential and/or Proprietary Information Agreement that all intellectual property created by him during his employment (subject to inapplicable exceptions) belongs to Jump.

86.     Jump has fully performed pursuant to the Confidential and/or Proprietary Information Agreement.

87.     If Heeger is permitted to launch a business venture that aims to develop a new blockchain platform, Heeger will inevitably use and disclose Jump's Confidential and/or Proprietary Information for his own benefit and for the benefit of his new venture.

88.     Jump has suffered or will suffer irreparable injury by the breach of the Confidential and/or Proprietary Information Agreement in the form, among others, of actual and potential misuse of and/or release of highly confidential and proprietary information by and to a competitor.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Jump respectfully requests that the Court:

1.     Following a hearing, enter a Preliminary Injunction enjoining Heeger and all those acting in concert with him from:

---

[43] *See id.* § 3(c).

      a.     Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that is engaged in any aspect of Jump's business where Heeger's role is, or is expected to be, a similar role, no matter where Heeger is located;

      b.     Becoming an employee of, a partner or principal in, or advisor or consultant to, any entity that is engaged in any aspect of Jump's business where confidential information Heeger had access to would be useful in the performance of his job responsibilities, no matter where Heeger is located;

      c.     Engaging in or preparing to engage in any activity that constitutes Jump's business to the extent such activity is similar to work Heeger did, services Heeger provided, expertise Heeger used for Jump, or activity to which confidential information to which Heeger was exposed at the Jump pertains, no matter where Heeger is located;

      d.     Developing or overseeing the development of software or hardware platforms with direct or indirect application to Trading to the extent such activity is similar to work Heeger did, services Heeger provided, expertise Heeger used for Jump, or activity to which confidential information to which Heeger was exposed at the Jump pertains, no matter where Heeger is located;

e.    Performing any work for his new venture and/or encouraging or allowing anyone else to perform work for his new venture; and/or

f.    Using or disclosing Jump's Confidential and/or Proprietary Information.

2.    Order Heeger to return to Jump's counsel any and all records or information pertaining to Jump's Confidential and/or Proprietary Information, including any intellectual property that Heeger developed while he was a Jump employee, whether in the original, copies, computerized, handwritten, or any other form, and purge such information from Heeger's possession, custody, or control, provided, however, that any information so purged shall be printed and saved to a computer disk or similarly accessible and readable recording device prior to purging and be returned to Jump pursuant to this paragraph;

3.    Award Jump attorneys' fees, costs, and expenses; and

4.    Award Jump any other relief that the Court may deem just and proper.

Dated: January 21, 2025              Respectfully submitted,

/s/ *Chris Gair*
Chris Gair (ARDC #6190781)
Lisa Wood (ARDC #6304324)
Ingrid Yin (ARDC #6339857)
Gair Gallo Eberhard LLP
1 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601
(312) 600-4900
cgair@gairgallo.com
lwood@gairgallo.com
iyin@gairgallo.com

*Attorneys for Plaintiff Jump Operations, LLC*

## **VERIFICATION**

I, David Heatley, Director of Strategic Initiatives at Jump Trading Group, have read the foregoing Verified Complaint and believe the facts set forth therein are true based on my personal knowledge or information that I have reviewed and, where indicated, on information and belief. I declare under penalty of perjury under the laws of the United States that the foregoing statements set forth in the Verified Complaint are true and correct.

_____          Dated _21 January 2025_
David Heatley