**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JUMP OPERATIONS, LLC,

        Plaintiff,

   v.

LIAM HEEGER,

        Defendant.

Case No. 1:25-cv-00703

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

**Page**

RELEVANT ALLEGATIONS................................................................................................. 2

ARGUMENT ....................................................................................................................... 4

    I.     JUMP DOES NOT ESTABLISH A BASIS FOR EQUITABLE
         REMEDIES.................................................................................................... 4

    II.    PLAINTIFF'S DUTY OF LOYALTY CLAIM SHOULD BE
         DISMISSED. ................................................................................................. 6

        A.    Jump fails to plead facts sufficient to allege Liam breached a duty
             of loyalty. ............................................................................................ 7

        B.    Jump does not allege any harm from Liam's purported breach of
             the duty of loyalty. .............................................................................. 8

    III.   PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE
         NONCOMPETE AGREEMENT....................................................................... 9

        A.    Section 16600 voids the Noncompete Agreement.................................... 9

        B.    The Noncompete Agreement is unenforceable under Illinois law........... 10

             1.    The Noncompete Agreement does not protect any
                 legitimate business interest of Jump and is overly broad. ........... 10

                   a.    The Noncompete Agreement operates as an industry
                      ban.................................................................................. 11

                   b.    The Noncompete Agreement is unreasonable in
                      time and geographic scope................................................. 12

             2.    The Noncompete Agreement is oppressive and injurious to
                 the public................................................................................... 13

              3.    The Noncompete Agreement is not supported by adequate
                 consideration under the IFWA................................................. 14

    IV.   PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE
         CONFIDENTIALITY AGREEMENT............................................................... 14

CONCLUSION................................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Arcor, Inc. v. Haas*,
   363 Ill. App. 3d 396 (2005) ............................................................................11, 13

*AssuredPartners, Inc. v. Schmitt*,
   44 N.E.3d 463 (Ill. App. Ct. 2015) ...............................................................10, 13

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
   471 F.3d 745 (7th Cir. 2006) ...................................................................................6

*Bougie v. Barth-Niggemann*,
   2022 WL 152873 (Ill. App. Ct. Jan. 18, 2022) ......................................................6

*Brickstructures, Inc. v. Coaster Dynamix, Inc.*,
   2017 WL 4310671 (N.D. Ill. Sept. 28, 2017) .........................................................8

*Busey Bank v. Turney*,
   2022 WL 4079462 (N.D. Ill. Sept. 6, 2022) .........................................................15

*Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*,
   879 N.E.2d 512 (Ill. App. Ct. 2007) ...............................................................10, 12

*Cincinnati Tool Steel Co. v. Breed*,
   482 N.E.2d 170 (Ill. App. Ct. 1985) .......................................................................5

*Dancor Const., Inc. v. FXR Const., Inc.*,
   64 N.E.3d 796 (Ill. App. Ct. 2016) .......................................................................10

*Destiny Health, Inc. v. Conn. Gen. Life Ins. Co.*,
   39 N.E.3d 275 (Ill. App. Ct. 2015) .......................................................................14

*DM Trans, LLC v. Scott*,
   38 F.4th 608 (7th Cir. 2022) ..............................................................................5, 6

*Elleby v. Forest Alarm Serv., Inc.*,
   164 N.E.3d 613 (Ill. App. Ct. 2020) .......................................................................7

*Fleetwood Packaging v. Hein*,
   2014 WL 7146439 (N.D. Ill. Dec. 15, 2014) .......................................................15

*Glazer v. Priv. Residences at Ont. Place Condo. Ass'n*,
   205 N.E.3d 163 (Il. App. Ct. 2022) .......................................................................9

*Goplin v. WeConnect, Inc.*,
   893 F.3d 488 (7th Cir. 2018) ...................................................................................2

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Ill. Beta Chapter of Sigma Phi Epsilon Fraternity Alumni Bd. v. Ill. Inst. of Tech.*,
    946 N.E.2d 1118 (Ill. App. Ct. 2011) ...........................................................6

*Ixmation, Inc. v. Switch Bulb Co., Inc.*,
    2014 WL 5420273 (N.D. Ill. Oct. 23, 2014)....................................................4

*Laba v. Chi. Transit Auth.*,
    2016 WL 147656 (N.D. Ill. Jan. 13, 2016) .....................................................7

*LaSalle Bank Lake View v. Seguban*,
    937 F. Supp. 1309 (N.D. Ill. 1996) ...............................................................8

*Liautaud v. Liautaud*,
    221 F.3d 981 (7th Cir. 2000) ...............................................................10, 13

*LKQ Corp. v. Rutledge*,
    96 F.4th 977 (7th Cir. 2024) .......................................................................13

*nClosures Inc. v. Block & Co.*,
    770 F.3d 598 (7th Cir. 2014) ......................................................................15

*Oce N. Am., Inc. v. Brazeau*,
    2010 WL 5033310 (N.D. Ill. Mar. 18, 2010)............................................12, 13

*Prairie Rheumatology Assocs., S.C. v. Francis*,
    24 N.E.3d 58 (Ill. App. Ct. 2014) ................................................................14

*Saban v. Caremark Rx, LLC*
    780 F. Supp. 2d 700 (N.D. Ill. 2011) .............................................................5

*Shaffer v. Globe Prot., Inc.*,
    721 F.2d 1121 (7th Cir. 1983) ......................................................................5

*Symbria, Inc. v. Callen*,
    2022 WL 60530 (N.D. Ill. Jan. 6, 2022) .........................................................8

*Triumph Packaging Grp. v. Ward*,
    834 F. Supp. 2d 796 (N.D. Ill. 2011) ....................................................10, 12, 13

*Unisource Worldwide, Inc. v. Carrara*,
    244 F. Supp. 2d 977 (C.D. Ill. 2003) .............................................................12

*Unite Here Health v. La Plaza Secaucus, LLC*,
    2014 WL 287447 (N.D. Ill. Jan. 27, 2014).......................................................5

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United Asset Coverage, Inc. v. Avaya Inc.*,
409 F. Supp. 2d 1008 (N.D. Ill. 2006) ........................................................................4

**Statutes**

Bus. & Prof. Code
§ 16600..........................................................................................................................9, 14

Defendant Liam Heeger ("Liam") is a talented engineer with nearly a decade's experience building software. He has been working in the cryptocurrency industry for the last five years. Throughout his career, Liam has regularly taken on new challenges and expanded the scope of his work with the goal of pushing the boundaries and innovating on existing technology. Now, Liam is faced with a former employer—Jump Operations, LLC ("Jump")—who seeks to obstruct that innovation without any valid business interest, driven solely by its blatant desire to control and illegitimately claim ownership over a company Liam is launching.

Liam did not launch a competitive business or steal any of his former employer's property or information. Liam is building, from the ground up, the foundational structure (also known as "layer-1") for a new blockchain network.[1] By contrast, at Jump, Liam built discrete tools to enable specific functionalities for *existing* blockchain networks operated by other entities—not Jump. If allowed to continue, both Liam and Jump will operate in different segments of the cryptocurrency industry. They will have distinct product offerings intended to address distinct markets. These ventures are undeniably complementary rather than competitive. Jump is not facing imminent, irreparable harm through Liam continuing with his work. There is no reason for this matter to be before this Court.

Jump's Complaint seeking injunctive relief fails for four primary reasons. **First**, Jump has not established a legitimate business interest supporting the extraordinary equitable remedies it is seeking from this Court pending resolution of the matter in arbitration. **Second**, there is no plausible allegation that Liam breached his duty of loyalty to Jump during his employment or that

---

[1] A "blockchain" or "blockchain network" is a technology product that acts as a digital, decentralized, public ledger that maintains records of digital asset ownership and transactions. ECF No. 13 ("Compl." or "Complaint") ¶ 18. A layer-1 blockchain—what Liam is building—is the foundational structure of a blockchain network, such as Solana, Bitcoin, or Ethereum. It is called "layer-1" because it provides the core rules, infrastructure, and security for the entire network, upon which other applications and technologies can be built. *See id.* ¶¶ 21-22.

any such speculative breach harmed Jump. ***Third***, the Complaint cannot state a breach of contract claim based on the noncompete where the contract at issue violates both Illinois and California law. ***Fourth***, the claim premised on alleged breach of the nondisclosure obligation fails as a matter of law because the Complaint does not plausibly identify any protectible confidential information with specificity, much less the theft or use of such information.

To allow such a legally flawed Complaint to evade dismissal and force Liam to incur the costs of opposing a preliminary injunction motion would reward Jump's unjustified efforts seeking to disrupt and block Liam's innovative work based solely on its illegitimate desire to own and control whatever Liam creates. There is no urgent need for Court intervention, no forensics showing any theft of confidential information or intellectual property belonging to Jump, and no legitimate business interest connected to the claims in the Complaint that supports the injunctive relief sought. Simply put, there is no basis for the matter to be before this Court, and the Complaint should be dismissed.

## RELEVANT ALLEGATIONS

Liam is a software engineer who worked for Jump for less than two years on a contract to build a blockchain validator client for Jump's customer Solana Foundation ("Solana").[2] Compl. ¶¶ 1, 22, 24-25. This is Jump's business in the crypto industry: Jump exclusively builds tools to enhance existing blockchain networks.[3] By contrast, Liam left Jump to build his own layer-1 blockchain network and is not seeking to sell any services or tools to existing blockchain

---

[2] A blockchain is comprised of many technological parts, including a mechanism to confirm transactions are legitimate and accurate (a "validator"). Compl. ¶ 18.

[3] *See Jump Crypto Sets Out to Build New Validator Client for the Solana Blockchain to Increase the Throughput and Reliability of the Network*, Jump Crypto (Aug. 16, 2022), https://jumpcrypto.com/writing/jump-crypto-sets-out-to-build-new-validator-client-for-the-solana-blockchain-to-increase-the-throughput-and-reliability-of-the-network/ ("Jump Crypto will propose significant upgrades to Solana's open-source core software along with building a second and new validator client, separate from the one originally built by Solana Labs."). The Court can take judicial notice of public websites of the parties. *See Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018).

networks. *See* Compl. ¶ 5. Jump does not allege Liam is developing tools, enhancements, or other products or services for any other blockchain network developers, including Solana. In other words, in no scenario will Liam sell or market any product or service Jump develops or offers. Indeed, Jump openly admits that the blockchain network it seeks to protect from competition is not even Jump's intellectual property—it belongs to its customer, Solana. *See id.* ¶ 22.

In 2022, Solana hired Jump to develop a new validator tool for Solana's network. *Id.* ¶¶ 22-23. Liam started working on Project Firedancer—Jump's name for the validator tool—in 2023. *Id.* ¶¶ 22, 24-25. The Complaint does not identify with any particularity (beyond categories and broad generalities) what confidential information belonging to Jump is involved with Project Firedancer. In fact, Jump's Complaint entirely glosses over the fact that *nearly all the software code for Project Firedancer is open source and available to anyone to use however they want*.[4] The same is true for the code related to the Solana blockchain.[5]

When Liam began employment at Jump, he signed an employment offer letter and agreements with Jump that contain nondisclosure obligations (the "Confidentiality Agreement") and a noncompetition covenant (the "Noncompete Agreement"). Compl. ¶ 34. Liam has been transparent with Jump about his intention to build a new blockchain network. *Id.* ¶¶ 63, 65. He has repeatedly provided assurances that he has no intention of using or disclosing any of Jump's confidential information as part of that work. *Id.* ¶¶ 63, 67. Jump does not dispute that Liam is

---

[4]*See Firedancer Guide*, https://docs.firedancer.io/guide/firedancer.html (last updated Aug. 26, 2024, 12:01 PM) ("Firedancer is open source and being developed on GitHub. All contributions are welcome. Jump is currently the primary contributor as the project is in the initial development phase, but Firedancer is a decentralized, community validator and project stewardship will be transitioned to the community as the project matures.").

[5]This free use ethos is reflected in statements from Solana Foundation, which describes the Solana blockchain as follows: "Anyone in the world can view, download, modify the validator source code, and run the software to participate in the operation and security of the network. There is no single entity that controls how the network runs, or what kinds of applications or services can be built or used on top of the network. In this way, Solana is 'permissionless,' meaning that nobody needs anyone's permission to participate, develop, extend or use the network." Solana Foundation, *Validator Health Report: August 2022* (Aug. 9, 2022), https://solana.com/news/validator-health-report-august-2022.

building a blockchain network and not tools. *See id.* ¶ 63. Instead, it is alleging that Liam cannot do *anything* in the cryptocurrency industry (regardless of whether Jump does it or not) based on the provisions in his Noncompete Agreement. *See infra* 11-12; Compl., Ex. B.

Jump also does not allege that Liam stole anything when he left his employment. Instead, Jump speculates that Liam will "inevitably" use Jump's "Confidential and/or Proprietary Information," Compl. ¶ 87, but nowhere indicates what information, if any, Liam will use, much less when, how, or where he will use or disclose it, *id.* ¶ 80. And while the Complaint alleges without support that Liam began working on this new blockchain during his employment at Jump, *id.* ¶ 69, the Complaint provides no specifics on what work Liam supposedly did beyond speculation and conclusory assertions.

## ARGUMENT

### I.    JUMP DOES NOT ESTABLISH A BASIS FOR EQUITABLE REMEDIES.

The parties contractually designated the American Arbitration Association ("AAA") as the appropriate forum to resolve disputes regarding Liam's employment, and Jump has already initiated an arbitration proceeding with the AAA. *See* Compl. ¶¶ 9, 14, Ex. D § 10(c). Jump concedes its claims can only survive in this Court to the extent it alleges imminent, irreparable harm warranting injunctive relief. *See id.* ¶ 9; *United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1041 (N.D. Ill. 2006) (plaintiff must show harm that is both irreparable and imminent to be entitled to injunctive relief). Any causes of action for which Jump does not state a claim for injunctive relief must be resolved in arbitration.

Jump, however, does *not* identify actual and imminent irreparable injury, even though over three months have passed since Liam resigned from Jump. *See* Compl. ¶ 61; *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23,

2014) ("[U]nexcused delay . . . implies a lack of urgency and irreparable harm.");[6] *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (finding plaintiff's two-month delay to be "inconsistent with a claim of irreparable injury"). Jump has not alleged Liam exfiltrated any of Jump's documents or files or used any of Jump's intellectual property or confidential information. It has not said Liam's new venture will do what Jump does, i.e., develop tools or services for blockchain networks. Rather, Jump argues equitable relief is necessary to protect against generalized, potential, and future harm, speculating it "has suffered *or will* suffer irreparable injury . . . in the form, among others, of actual and *potential* misuse of and/or release of highly confidential and proprietary information by and to a competitor." Compl. ¶ 88.

This is insufficient to state a claim for injunctive relief under Illinois law. *See, e.g.*, *DM Trans, LLC v. Scott*, 38 F.4th 608, 621 (7th Cir. 2022) (holding a former employee's use of confidential information did not warrant injunctive relief without an identifiable threat of irreparable harm that could not be alternatively remedied); *Cincinnati Tool Steel Co. v. Breed*, 482 N.E.2d 170, 174 (Ill. App. Ct. 1985) (affirming denial of preliminary injunction where "[a]ny suggestion that defendant did take documents on this record 'is purely speculative' and insufficient to establish irreparable injury"); *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 714-15 (N.D. Ill. 2011) (finding no irreparable harm absent showing that any confidential information of former employer had been disclosed or used by former employee in new employment).

Jump's suggestion that competition between Solana and Jump could negatively affect Solana's viability as a blockchain network (i.e., result in decreased business flowing from Solana to Jump, *see* Compl. ¶ 64) is just more speculation. Any attenuated harm to Jump in this years-down-the-line scenario is certainly not imminent—nor irreparable. *See Unite Here Health v. La*

---

[6] Unless otherwise noted, all emphasis is added, and all citations and quotations are omitted.

*Plaza Secaucus, LLC*, 2014 WL 287447, at *2 (N.D. Ill. Jan. 27, 2014) ("[A] plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries."). Moreover, the value of Jump's contract with Solana is quantifiable, and thus money damages could remedy any hypothetical harm. *See DM Trans, LLC*, 38 F.4th at 621 (rejecting allegation that defendants' use of confidential information could give rise to irreparable harm through lost sales and profits where lost sales and profits could be quantified); *Ill. Beta Chapter of Sigma Phi Epsilon Fraternity Alumni Bd. v. Ill. Inst. of Tech.*, 946 N.E.2d 1118, 1122 (Ill. App. Ct. 2011) ("Injunctive relief is disfavored where the gravamen of a complaint is breach of contract and the trial court could award damages if it found a breach occurred.").

Jump tries to fall back on language in Liam's Noncompete Agreement to allege irreparable harm, Compl. ¶ 8, but ignores that a contractual provision avowing irreparable harm is "insufficient to support a finding of irreparable harm and an award of injunctive relief" "and d[oes] not eliminate the need to meet the requirements for a permanent injunction." *Bougie v. Barth-Niggemann*, 2022 WL 152873, at *11 (Ill. App. Ct. Jan. 18, 2022). Jump has simply not met its burden to plausibly allege facts that irreparable and imminent harm will occur and therefore cannot proceed with its claims in this Court. The arbitration proceeding is the appropriate forum.

## II.   PLAINTIFF'S DUTY OF LOYALTY CLAIM SHOULD BE DISMISSED.

Jump alleges Liam breached a duty of loyalty because he did not devote his "full business time, attention, and best efforts to the performance of [his] duties" during the final weeks of his employment. Compl. ¶ 72. Jump's claim fails because, relying on speculation alone, Jump is unable to plead a breach of any duty of loyalty, much less allege how any purported breach is tied to any harm to Jump. *See Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (plaintiff must establish "the existence of a fiduciary duty, breach of that duty, and damages proximately resulting from that breach").

-6-

**A.      Jump fails to plead facts sufficient to allege Liam breached a duty of loyalty.**

Jump alleges Liam breached a duty of loyalty because "it *appears* [Liam] started work on [a] competing venture" while still an employee at Jump. Compl. ¶ 7. Jump's speculation relies on four specious allegations. According to Jump, Liam must have worked on a new project during his final weeks because he (i) announced he was launching a business one month after he resigned, *id.* ¶ 69; (ii) exhibited "odd behavior during his final weeks," *id.*; (iii) proffered an allegedly false pretense for his resignation, *id.* ¶ 61; and (iv) purportedly held "secret" meetings with venture capital firms at Solana's Breakpoint conference, *id.* ¶¶ 57, 69.

These allegations are pure guesswork—as Jump itself acknowledges, *see, e.g.*, *id.* ¶¶ 5 (alleging Liam had secured funding within one month after his resignation "and *potentially* earlier"); 7 (stating it "*appears*" Liam began preparing to launch his new venture prior to separating from Jump); 57, 59, 66 (alleging breach "on information and belief"). *First*, the fact that Liam was working on a new project a month after his employment with Jump ended does not *ipso facto* make it plausible that he was secretly working on this project before his separation. Jump "cannot state a claim for breach of fiduciary duty by alleging *potentially* improper conduct." *Elleby v. Forest Alarm Serv., Inc.*, 164 N.E.3d 613, 627 (Ill. App. Ct. 2020) (cleaned up).

*Second*, allegations that Liam was texting more than normal and seemed "stressed and distracted from his work," Compl. ¶ 59, "amount[] to negligent job performance, rather than disloyalty." *Laba v. Chi. Transit Auth.*, 2016 WL 147656, at *7 (N.D. Ill. Jan. 13, 2016) (distinguishing "unusual" behavior and "substandard job performance" from cases where employees breached their duties by downloading confidential documents or embezzling funds).

*Third*, Liam's truthful statement to Jump that he was resigning because he was "just not enjoying [his] work at Jump any more, among other factors" does not support Jump's claim that "he had been acting improperly" during his final weeks of employment. Compl. ¶ 61. This is pure

speculation and falls short of the plausibility standard, which "requires [Jump] to allege facts that add up to more than a sheer possibility that [Liam] acted unlawfully." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 2017 WL 4310671, at *4 (N.D. Ill. Sept. 28, 2017).

*Finally*, Jump's allegation that Liam held "secret" meetings with venture capital firms during a Solana conference, Compl. ¶¶ 57, 69, is also just conjecture. S*ee e.g.*, *id.* ¶¶ 57 (alleging off-stage meetings "on information and belief"), 69 (alleging "apparent" meetings). Even had such a meeting occurred, a mere meeting with a venture capital firm at a conference where many venture capital firms were in attendance does not equate to breach of the duty of loyalty.

In sum, Jump has failed to support its breach of loyalty claim with any plausible factual allegations. There is no evidence and no allegation that Liam developed any technology for his new venture prior to his resignation. That Liam used a personal GitHub account throughout his employment *in performing his duties for Jump* is entirely unremarkable. The account is public—https://github.com/CantelopePeel?tab=overview&from=2024-05-01&to=2024-05-31—and shows that Liam used it to work on Project Firedancer, which is open source and available for anybody to use however they want, *see supra* n.4. Moreover, Jump's speculations about Liam's allegedly disloyal behavior are easily distinguished from the allegations that Illinois courts typically find sufficient to state a claim for breach of the duty of loyalty. *See, e.g.*, *Symbria, Inc. v. Callen*, 2022 WL 60530, at *17 (N.D. Ill. Jan. 6, 2022) (downloading and copying an employer's data for the purposes of competing with that employer later"); *LaSalle Bank Lake View v. Seguban,* 937 F. Supp. 1309, 1324 (N.D. Ill. 1996) (embezzling funds from employer). Jump's generic and speculative claims about Liam pale in comparison and must be dismissed.

### B.    Jump does not allege any harm from Liam's purported breach of the duty of loyalty.

Beyond failing to establish a breach, Jump has also failed to establish any harm caused by

Liam's new venture—whether resulting from work after his resignation or from the supposed work Jump speculates he engaged in prior. Indeed, no harm could exist where *Liam's new project does not compete with Jump*, *see, e.g.*, *supra* 2-3. It is unsurprising, then, that Jump fails to identify any harm resulting from Liam's alleged breach of a duty of loyalty. Even if harm were to exist (and it is unclear how that would be possible), Jump has not shown how or why money damages would be insufficient to make Jump whole, as required to obtain injunctive relief, *see supra* 6. Jump's claim should be dismissed by this Court and instead proceed in the already-initiated arbitration proceedings. *Glazer v. Priv. Residences at Ont. Place Condo. Ass'n*, 205 N.E.3d 163, 173 (Il. App. Ct. 2022) (affirming dismissal of breach of fiduciary duty claim where "[i]t is clear from the face of plaintiffs' complaint that they suffered no injury from any alleged breach").

### III.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE NONCOMPETE AGREEMENT.

Jump's noncompete claim fails because Jump cannot plead the existence of a valid and enforceable contract: the Noncompete Agreement is void under California's Bus. & Prof. Code Section 16600 ("Section 16600") and unenforceable under Illinois common law and the Illinois Freedom to Work Act (820 Ill. Comp. Stat. Ann., referred to herein as the "IFWA").

#### A.    Section 16600 voids the Noncompete Agreement.

The Noncompete Agreement is void because Liam is a California citizen, *see* Compl. ¶ 11. California shares the state of Illinois' distrust of noncompetes and passed a law last year, SB 699, which strengthened Section 16600's long-standing noncompete ban to encompass out-of-state agreements. Section 16600 applies "*regardless of where and when the contract was signed*" and "*regardless of whether . . . the employment was maintained outside of California*." Section 16600.5(a)-(b). Under the applicable choice of law analysis, California has a materially greater interest in *not* enforcing the Noncompete Agreement against one of its citizens than Illinois

has in enforcing it, particularly where Illinois already disfavors noncompetes. *Dancor Constr., Inc. v. FXR Constr., Inc.*, 64 N.E.3d 796, 815 (Ill. App. Ct. 2016) (applying New York law where New York had a materially greater interest in the determination of the Illinois forum-selection-clause issue and Illinois "implicitly share[d]" New York's interest).

**B.      The Noncompete Agreement is unenforceable under Illinois law.**

Even assuming California law does not apply, Jump's claim fails because it has not alleged a valid and enforceable contract under Illinois law. Illinois courts "abhor restraints on trade" and therefore "carefully scrutinize[]" restrictive covenants." *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000). Noncompetes cannot "1) impose restrictions greater than those necessary to protect the legitimate interests of the protected party; 2) [be] oppressive to the restricted party; or 3) [be] harmful to the general public." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 814 (N.D. Ill. 2011). Liam's noncompete is unenforceable because it fails each prong. On top of that, it lacks adequate consideration under the IFWA.

**1.      The Noncompete Agreement does not protect any legitimate business interest of Jump and is overly broad.**

Under the IFWA and Illinois common law, restrictions "should be narrowly tailored to protect only against activities that threaten the employer's interest." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 526 (Ill. App. Ct. 2007); IFWA 90/15(3) (the covenant cannot be greater than is required for the protection of a legitimate business interest). "Whether a legitimate business interest exists is based on the totality of the facts," including "the employee's acquisition of confidential information through his employment, and time and place restrictions." *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 471 (Ill. App. Ct. 2015).

### a.    The Noncompete Agreement operates as an industry ban.

Here, the Noncompete Agreement is as far from "narrowly tailored" as you can get. It prohibits Liam from "engag[ing] directly or indirectly in Competitive Activity, including assisting another to engage in Competitive Activity," and defines "Competitive Activity" as engaging in or doing any of *nineteen* activities, such as, for example, "any activity that constitutes part of the Business of the Group Companies to the extent such activity is Related Activity." Compl., Ex. B § 2. The terms "Business" and "Related Activity" are in turn defined so broadly as to encompass the entire financial services *and* cryptocurrency industries, *see id.* §§ 1(a), 2(f).[7]

What the Noncompete Agreement prohibits Liam from doing is much broader than what he in fact did at Jump. At Jump, Liam built tools to enable specific functionalities for *existing* layer-1 blockchains operated by other entities; in the company he is starting, Liam is building a *new* layer-1 blockchain, something he never did at Jump and something Jump does not do, *see supra* 2-3. But the Noncompete Agreement, at least as Jump seeks to enforce it, would forbid Liam from creating this company—or indeed doing nearly anything in the crypto industry (or even anything in asset management, *see id.*, Ex. B § 1(a)(i)). It is unclear what job in the industry would be acceptable under the noncompete if it prohibits Liam from even developing something Jump does not sell or build.

Illinois courts consistently find broad noncompetes like these unenforceable because precluding employees "from working, in any capacity, in the [employer's] industry" does not serve any legitimate business interest. *Arcor, Inc. v. Haas*, 363 Ill. App. 3d 396, 405-06, (2005)

---

[7] "Business," for example, covers everything from "trading and investing in and with reference to a wide range of products, instruments, items and events" to "blockchain validation/mining; blockchain infrastructure-as-a-service; blockchain networks, protocols, chains, platforms, and tokens (collectively, 'Blockchain Projects'); and systems and platforms for use in connection with Blockchain Projects." Compl., Ex. B § 1(a). Remarkably, the Noncompete Agreement describes Jump's business as broader than it is. For example, Jump is *not* (nor has any plans to be) in the business of developing "blockchain networks, protocols, chains, platforms, and tokens." *Id*; *see supra 2-3*.

(covenant which prohibited employee from "entering into or engaging in the business conducted by employer" constituted a "blanket prohibition on competition"); *Cambridge Eng'g, Inc.*, 378 Ill. App. 3d at 450 (noncompete that prevented employee from "engag[ing] in any business that competes with [the former] [e]mployer" was unnecessary to protect legitimate business interests where it barred "all activities on behalf of competitors . . . , regardless of whether they are actually competitive"); *Oce N. Am., Inc. v. Brazeau*, 2010 WL 5033310, at *9 (N.D. Ill. Mar. 18, 2010) (noncompete was unenforceable where it prohibited employee from working with any company that competes with plaintiff in any segment of the [relevant industry] nationwide).

The Noncompete Agreement's blanket ban on all activities in any way related to Jump's business is particularly egregious "in light of the limited arenas in which [Liam]'s knowledge [of Jump information] would be competitively useful." *Cambridge Eng'g.*, 378 Ill. App. at 452. Jump has not even identified, beyond broad categories, *see* Compl. ¶ 28, the confidential and proprietary information supposedly at risk of misuse—or indeed *how* the information would be of any use to Liam in building a blockchain that, if anything, would compete with *Solana*, not Jump, *see id.* ¶ 64. Jump fails to allege a legitimate business interest on these facts. *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 989 (C.D. Ill. 2003) (finding noncompete lacked a legitimate business interest because the information plaintiff sought to protect was not confidential).

### b.    The Noncompete Agreement is unreasonable in time and geographic scope.

Jump seeks to enforce an unreasonably lengthy noncompete of two years, Compl. ¶ 62, to be tolled in the event of an alleged breach, with the possibility of a six-month extension, *id.*, Ex. B §§ 8, 3(a). This is temporally overbroad. *See Triumph Packaging*, 834 F. Supp. 2d at 815 (finding noncompete with 24-month restricted period unenforceable and "very lengthy"); *Oce N. Am.,* 2010 WL 5033310 at *9 (finding unenforceable a one-year covenant not to compete that

barred former employee from working for a "competing business" in the United States). As for any geographic restrictions, the Noncompete Agreement has none, *see* Compl., Ex. B, and is thus unreasonably broad in territorial reach as well. *See Arcor*, 363 Ill. App. 3d at 405 (noncompete unenforceable where it contained no geographic limitation); *Triumph Packaging*, 834 F. Supp. 2d at 814 (noncompete prohibiting employee from working with any competitor "within any geographical area" in which employer did business or had plans to do business was "extremely broad in geographical scope" and unenforceable).[8]

The result is a noncompete that prohibits Liam from working in the crypto industry anywhere in the world for at least two years. Jump has not alleged any legitimate business interest requiring such a broad restraint on trade and thus fails to plead the existence of a valid contract.

### 2. The Noncompete Agreement is oppressive and injurious to the public.

The Noncompete Agreement's overbreadth makes it unduly burdensome on Liam and injurious to the public. The restrictive covenant is oppressive because it "forecloses work within an entire industry" for two years, limiting Liam's "right to ply his trade." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 982 (7th Cir. 2024) (striking noncompete); *AssuredPartners, Inc.*, 44 N.E.3d at 473 (finding undue hardship where noncompete forced employee to work in another country if he wanted to continue earning a living in his chosen industry). Enforcing the overbroad Noncompete Agreement also hurts the public because it pumps the brakes on a new business which could drive job creation and innovation. *See Liautaud*, 221 F.3d at 988 ("[T]he complete ban on expansion is injurious to the public because it . . . stifles competition."). Plaintiff should not be permitted to

---

[8] The Noncompete Agreement's time and place restrictions are particularly unreasonable because Liam's post-employment activity is already heavily circumscribed, *see supra* 11. Where "the temporal and geographic restrictions on an employee's conduct are broad, as they are here, the agreement's activity restrictions should be correspondingly narrowly drawn to protect the employee's ability to be employed in his chosen field." *Oce N. Am.*, 2009 WL 6056775, at *8 (finding unenforceable a one-year noncompete that barred former employee from working for a "competing business" in the United States).

unlawfully restrict a California resident's ability to earn a living, in violation of Section 16600 and despite Illinois' abhorrence of restraints on trade, just to punish Liam for leaving Jump's employ.

### 3. The Noncompete Agreement lacks adequate consideration under the IFWA.

Finally, the Noncompete Agreement is unenforceable as a matter of law under the IFWA, which requires noncompetes be supported by adequate consideration in the form of at least two years of employment, unless the employer provides other consideration sufficient to support the restrictive covenant, such as additional professional or financial benefits. IFWA 90/5. Here, Liam worked for Jump for less than two years, *see* Compl. ¶¶ 24, 61, and Jump provides no other adequate consideration tied specifically to his noncompete obligations. The closest thing is a post-termination payment that Jump retains the sole and exclusive discretion to pay—an illusory benefit that cannot form the basis of a promise not to compete. *See id.*, Ex. B § 4(b); *Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 63 (Ill. App. Ct. 2014) (noncompete lacked adequate consideration where defendant was employed for less than two years and any purported additional consideration was "illusory benefits"). The noncompete is therefore unenforceable under the IFWA, and Jump fails to state its breach of contract claim.

### IV. PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE CONFIDENTIALITY AGREEMENT.

Jump claims Liam "has breached and is threatening to further breach his non-disclosure and non-use obligations" under the Confidentiality Agreement, Compl. ¶ 85, but "fails to identify, with any degree of particularity, the alleged . . . confidential information" that is supposedly at risk of misuse. *See Destiny Health, Inc. v. Conn. Gen. Life Ins. Co.*, 39 N.E.3d 275, 282 (Ill. App. Ct. 2015) ("[I]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated.").

Moreover, for the generic categories that Jump does identify—"strategies, proprietary data,

research, and technology," Compl. ¶ 28—Jump fails to plead with any granularity *how* Liam has allegedly misappropriated the information in breach of his Confidentiality Agreement. Jump has not identified any forensic records showing downloads, uploads, print jobs, emails, or any other efforts to exfiltrate any confidential information. Nor has Jump shown how the information could be of any use to Liam in building a complementary company that could be Jump's customer, *see supra* 12. Even supposing the software code Liam developed for Jump's validator tool could somehow be used to develop Liam's blockchain, that code is nearly entirely open source and available for anyone to use however they want. *See supra* 3, nn. 4-5; *nClosures Inc. v. Block & Co.*, 770 F.3d 598, 602 (7th Cir. 2014) (confidentiality agreements enforceable only "when the information sought to be protected is actually confidential and reasonable efforts were made to keep it confidential").

Finally, Jump's conclusory allegation that Liam will "inevitably" use and disclose Jump's purported proprietary information if he is permitted to launch his new venture cannot save its contract claim. To trigger the doctrine, "a plaintiff must show more than the possibility that defendants *could* misuse the plaintiff's trade secrets; it must show that the defendants *will* misuse those secrets." *Fleetwood Packaging v. Hein*, 2014 WL 7146439, at *7 (N.D. Ill. Dec. 15, 2014) (emphasis in original); *Busey Bank v. Turney*, 2022 WL 4079462, at *9 (N.D. Ill. Sept. 6, 2022) (refusing to apply doctrine where complaint did not demonstrate that defendant "could not operate or function" in his new role without plaintiff's trade secrets).

Where there is no competition at issue and no trade secrets at risk, Jump fails to show why disclosure is inevitable. At every turn, Jump's allegations fall short of plausibly alleging breach of any enforceable contract or obligation, much less any resulting irreparable harm warranting injunctive relief.

## **CONCLUSION**

For the foregoing reasons, Liam respectfully requests that the Court grant his motion to dismiss the Complaint.

Dated: February 7, 2025

Respectfully submitted,

COOLEY LLP

*/s/ Miriam Petrillo*
Miriam Petrillo
Cooley LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606-1511
Telephone: (312) 881-6500
Facsimile: (312) 881-6598
mpetrillo@cooley.com

Gerard O'Shea (*pro hac vice* pending)
Erika Freeman (*pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
goshea@cooley.com
efreeman@cooley.com

Joseph D. Lockinger (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
jlockinger@cooley.com

*Attorneys for Defendant Liam Heeger*